# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

---

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

        Plaintiff,

   v.

DAVID W. BUTLER,

        Defendant.

Civil Action No. 00-1827

Judge Cercone

---

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES

Respectfully submitted by:

Douglas G. Thompson, Esq.
Donald J. Enright, Esq.
FINKELSTEIN, THOMPSON & LOUGHRAN
1050 30th Street, NW
Washington, DC 20007
(202) 337-8000

Attorneys for Defendant

## INTRODUCTION

The United States Securities and Exchange Commission (the "Commission" or the "SEC") initiated this litigation against David W. Butler ("Butler") on September 14, 2000, after more than three years of investigation (and the accompanying burden such investigation inflicts on an investigated party). The Commission's initial complaint alleged that Butler had profited from insider knowledge that his employer, FORE Systems, Inc. ("FORE"), was likely to fall short of analyst expectations and internal goals for revenues for the March 1997 quarter.

On April 18, 2005, the Court granted Butler's Rule 52(c) motion for Judgment. Thus, and as more fully discussed below, it is plain that Butler has prevailed in litigation initiated by the federal government of the United States of America, that the Commission's claims in this litigation were not substantially justified, and that, in fact, the Commission acted in bad faith throughout this litigation.

In defending himself in connection with this litigation, Butler expended some $721,109.50 on attorneys fees (representing 2,237.7 hours of time expended by his counsel) and $216,824.39 on other costs and expenses (including expert witness fees). Butler now seeks repayment of these fees and costs under the Equal Access to Justice Act (the "EAJA").

## ARGUMENT

### I.    STANDARDS OF LAW

#### A.    Recovery of Costs Under 28 U.S.C. § 2412(a)(1)

"[A] judgment for costs . . . may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. A judgment for costs

1

when taxed against the United States shall, in an amount established by statute, court rule, or order, be limited to reimbursing in whole or in part the prevailing party for the costs incurred by such party in the litigation." 28 U.S.C. § 2412(a)(1).[1]

### B.    EAJA Requirements for Recovery of Attorneys' Fees and Costs

The EAJA provides:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses. . . incurred by that party in any civil action . . . brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A).[2]   Thus, a "prevailing party is *entitled* to attorney's fees unless 'the court finds that the position of the United States was substantially justified.'" Grossberg v. Barnhart, No. 04-2397, 2005 U.S. App. LEXIS 4950 *5 (3rd Cir. March 29, 2005) (emphasis added; citing id.).   Moreover, "[t]he position of the United States includes not only its litigation

---

[1]    Such costs may include:

(1) Fees of the clerk and marshal;
(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
(3) Fees and disbursements for printing and witnesses;
(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
(5) Docket fees;
(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services.

See 28 U.S.C. § 1920.

[2]    To be eligible for an award of fees and expenses under EAJA, the party seeking fees must show that: (1) it is a prevailing party; (2) if an individual, his or her net worth did not exceed $2,000,000,000 at the time the action was filed or, if a corporation, its net worth did not exceed $7,000,000 and it did not have more than 500 employees at the time the actions was filed; and (3) that the fees and other expenses sought were incurred by that party in the civil action in which it prevailed. 28 U.S.C. §§ 2412(d)(1)(A)-(2)(B); SEC v. Comserv Corp., 908 F.2d 1407 (8th Cir. 1990). Butler's net worth as of September 14, 2000 was less than $1.9 million. See Exhibit 1 to the Declaration of Donald J. Enright, Esq. in Support of Motion for Sanctions and for an Award of Attorneys' Fees and Expenses (the "Enright Declaration") (Butler Affidavit affirming that his net worth at that time was less than $1.9 million).

2

position but also the agency position that made the lawsuit necessary." Washington v. Heckler,

756 F.2d 959, 961 (3d Cir. 1985) (citing Natural Resources Defense Council v. EPA, 703 F.2d

700, 708 (3d Cir. 1983). "Fees and other expenses" under this subsection include reasonable

attorney and expert fees, as well as reasonable costs of preparing studies or analyses necessary

for the litigation. 28 U.S.C. § 2412(d)(2)(A).

Significantly, the government bears the burden of proving its position was "substantially

justified" in accordance with EAJA. Grossberg, 2005 U.S. App. LEXIS 4960 at *5. The

"government's burden of showing substantial justification is a strong one and is not met merely

because the government adduces "some evidence" in support of its position. Washington, 756

F.2d at 961 (citing Tressler v. Heckler, 748 F.2d 146, 150 (3d Cir. 1984)). In "order to meet its

burden [of showing substantial justification], 'the government must show: (1) a reasonable basis

in truth for the facts alleged; (2) a reasonable basis in law for the theory it propounds; and (3) a

reasonable connection between the facts alleged and the legal theory advanced.'" Grossman,

2005 U.S. App. LEXIS 4960 at *5-6 (quoting Washington, 756 F.2d at 960).

## II.    BUTLER IS ENTITLED TO FEES AND COSTS UNDER EAJA

### A.    Butler Was the Prevailing Party in an Action Brought by an Agency of the Federal Government[3]

Butler, emphatically, is the prevailing party in this proceeding. The "prevailing party

standard is interpreted liberally and a litigant is a prevailing party under the EAJA if he succeeds

on any significant issue in the litigation that achieves some benefits on the merits." SEC v.

---

[3]    The Commission is considered an agency of the United States for the purposes of EAJA, and EAJA therefore applies to civil actions filed by the Commission. See Morelli, 1995 U.S. Dist. LEXIS 141 at *7 (holding that, where the SEC sued a private defendant, "[t]he United States was a party to this action. . . .")

Morelli, Case No. 91-3874, 1995 U.S. Dist. LEXIS 141 *8 (S.D.N.Y. Jan. 11, 1995). Butler won

a judgment in his favor under Fed.R.Civ.P. 52(c) at the close of the Commission's case-in-chief.

As such, Butler did not just succeed on *any* significant issue; he succeeded on *all* significant

issues in this case. Butler has accordingly obtained all the relief he sought and is therefore a

"prevailing party" for purposes of the EAJA. See Morelli, 1995 U.S. Dist. LEXIS 141 at *7

(holding that a defendant who defeated the SEC on a Rule 52(c)) motion was a prevailing party

for the purposes of EAJA).

### B.    The SEC's Case Was Not Substantially Justified

As a prevailing party, Butler is entitled to recover fees unless the Commission can

affirmatively demonstrate they were substantially justified in bringing this action. 28 U.S.C. §

2412(d)(1)(A). The Commission cannot make such a showing.[4]

This Court granted Butler's 52(c) motion for three separate and distinct reasons, each

individually sufficient to demonstrate that Butler did not possess material nonpublic information

when he made the challenged trades. First, "at the time Butler made the trades at issue, FORE

expected to meet both its internal revenue goals and external earnings per share goal for the

March 1997 quarter. Any information to the contrary, especially based on FORE's history of

back-end loaded quarters, was speculative at best." SEC v. Butler, 2005 U.S. Dist. LEXIS 7194,

* 42 (W.D. Pa. April 18, 2005). Second, given the information already in the public domain,

---

[4]       Denial of summary judgment against the applicant in the underlying case will not preclude or disadvantage the applicant's ability to be awarded fees under the EAJA. See, e.g., Reich v. Walter W. King Plumbing & Heating Contractor, Inc., 98 F.3d 147 (4th Cir. 1996) (upholding grant of fees and expenses under EAJA despite the fact that the plaintiff had avoided summary judgment); Flores v. Shalala, 49 F.3d 562 (9th Cir. 1995) (same). The fact that the Commission survived summary judgment is actually more indicative of bad faith on the part of the SEC, in that it was only by misrepresenting the facts of the case that the Commission even managed to bring this matter to trial. See Section II.B and II.C, infra.

"the information available to Butler did not 'significantly [alter] the 'total mix of information made available' to the public." Id. Third, "once the non-public information relied upon by the Commission [to justify this action] was made available to the investing public, such information had little, if any, effect on FORE's market price," thereby demonstrating that the information Butler possessed could not have been material. Id.

Any one of these three reasons sufficiently demonstrates the Commission's lack of substantial justification in bringing this action. Collectively, they make Butler's entitlement to an EAJA award clear.

1. **The SEC Lacked Substantial Justification For Alleging Butler Had Material Non-Public Information Indicating that FORE Would Not Meet Wall Street Expectations For The Fourth Quarter of 1997**

The Commission's claims were largely premised on the proposition that Butler illegally traded while in possession of "material nonpublic information that indicated that FORE Systems would not meet analyst revenue predictions for the fourth quarter of 1997." SEC Trial Brief at 5. See also SEC Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 15. This contention was plainly unsupported by the evidence. As this Court noted, the "information available to Butler at the time of his trades did not make it any more likely than not that FORE would fail to meet either internal or external revenue expectations." Butler, 2005 U.S. Dist. LEXIS 7194 at * 22.

In fact, the evidence showed quite the contrary to have been the case. The Court specifically noted that, to the extent the information indicated any trend for the quarter, the "bookings and revenue information available to FORE management at or about the time of Butler's option trading *indicated to everyone, except the Commission, that FORE was on track*

5

*to meet Wall Street expectations*." Id. at *26 (emphasis added).  Indeed, every single witness

deposed in this litigation with any knowledge of these facts testified to this effect.  See DX 76[5],

DX 83[6], DX 81[7], DX 85 at 191-192, DX 80 at 9:9 - 9:23 and 19:15 - 20:5.  The Commission

---

[5]     During his deposition on September 5, 2001, FORE's former COO Tom Gill testified under oath
as follows:

> Q.    During the course of that call [on March 17, 1997], did you learn anything that led you to believe
>       that it was unlikely that the company would meet Wall Street expectations for the March 1997
>       quarter?
> A.    No.
>                                              * * * *
> Q.    After that conference call and when you wrote this email [DX 164], what were your expectations
>       and beliefs as to what the company's revenues would be for the quarter ended March 1997?
> A.    120 million which was less than planned but enough to exceed Wall Street estimates and meet the
>       internal plan like the previous quarter.
> Q.    Do you have any reason to believe that anybody within the company did not share your belief and
>       expectation?
> A.    No.
>                                              * * * *
> Q.    And when did you first learn that the company would miss consensus estimates for this quarter?
> A.    Probably sometime between 10:00 and 11:00 on the 31st and midnight.
> Q.    When was the first time you learned that it would be likely that the company would miss Wall
>       Street expectations?
> Ms. Pappas:      Objection to form.
> A.    Probably between 6:00 and 10:00 the same day.

DX 76 at 262:8 - 262:13, 275:12 - 275:24, and 305:22 - 306:9.

[6]     During the course of his August 29, 2001 deposition, FORE's former Chairman and CEO, Eric
Cooper, testified as follows:

> Q.    Did you at any time during the quarter ended March 1997 ever learn or gain any understanding that
>       the company was not expected to achieve the outcomes set forth in this email?
> A.    No.
>                                              * * * *
> Q.    At any point did you ever learn that the company was going to miss earnings or revenue
>       expectations for the quarter ended March 1997?
> A.    Yes I did.
> Q.    When did you learn that?
> A.    The morning following the end of the quarter, Tom Gill had left me a summary on my voicemail.  I
>       believe I didn't get it until I woke up the next morning.
> Q.    And that was the first time that you learned that the company would not meet expectations?
> A.    Yes, it was.
>                                              * * * *
> Q.    Do you have any reason to believe that anyone at FORE Systems had any knowledge prior to the
>       last few days of the end of the quarter indicating that the company would not meet expectations?
> Ms. Pappas:      Objection as to what anybody else knew.

6

apparently entirely ignored this unanimous testimony, electing instead to continue on with its unsupported, baseless claims.

In fact, the Commission presented only one live witness at trial with knowledge concerning the expectations within FORE during the time in question: FORE's former COO, Tom Gill. Mr. Gill had repeatedly testified before trial that he had expected FORE to meet analyst expectations for the March quarter at the time of Butler's trades. See Note 3, supra. Thus, the Commission took this case to trial knowing full well that there was simply no support for its position.[8]

---

A.      I think it was possible up until the last moments of that quarter for us to have met our projections if the cards had landed right, as it were, so I don't see how anyone could have known otherwise.
                                        * * * *
Q.      As of March 17th or March 18th, 1997, after receiving this Email [DX164], did you expect the company to meet Wall Street expectations for that quarter?
Ms. Pappas:      Objection, leading.
A.      We did.
Q.      And when you say we, who do you mean?
A.      Tom Gill and myself. We would have viewed this as a snapshot indicating how much more work was to be done but we felt we could do.

See DX 83 at 32:11- 32:16, 33:3 - 33:16, 38:18 - 39:4, and 45:10 - 45:19

[7]      Kirk Wrigley, FORE's former VP of North American Sales, testified at his deposition on August 2, 2001 as follows:
Q:      As you sit here today and as you recall the March 31, 1997 quarter, do you have any recollection as to whether it was a good quarter or a bad quarter?
A:      I don't remember that being a bad quarter.
Q:      Okay. And is it your testimony today that in fact at the time during the quarter, you did not believe it was going to be a bad quarter?
A:      I always believed we would somehow pull it out. It was never easy.

DX 74 at 148:7 - 148:16.

[8]      The Commission also submitted the deposition testimony of Michael Maniglia, and tried to twist and misrepresent it to confuse the trier of fact. See Section II.C.3, infra. Nevertheless, Mr. Maniglia clearly testified that, given FORE's bookings and backlog status as of March 17, 1997, he would predict FORE to record revenues "probably in the $120 [million] range" or "slightly higher" for that quarter. DX 85 at 191-92.

7

Not only did the Commission have no evidence to indicate the interim financial results at issue indicated that FORE was likely to fall short of Wall Street expectations for that quarter, it was aptly demonstrated before the trial that the information available to Butler was a very poor indicator of any quarter-end outcome, good or bad. Michael Maniglia's deposition testimony made this clear:

> Q: . . . [W]ould you say that you would find it difficult to actually estimate actual revenues in the company's actual quarterly financial results based only on bookings information two weeks before the end of the quarter?
> A:    It would be much more difficult, yes.

DX 85 at 172.

> Q.    So it would be difficult for anyone possessing just [bookings] information to reach an accurate estimate; is that correct?
> A.    It's difficult to reach an accurate estimate, yes.

Id. at 239.[9]

The Commission even acknowledged that the weight of the evidence, in the form of testimony from former FORE employees, made it clear that the data available to Butler was not a reliable predictor of quarterly revenues, and yet explicitly declared that the Commission was, without any basis or support, ignoring and discounting that evidence. In fact, the SEC's Memorandum of Law in Support of its Motion for Summary Judgment on Liability stated at note 17:

> Much of the factual record developed by defendant in this case is devoted to various former FORE Systems' employees stating that bookings information was

---

[9]    Since FORE's quarters were historically back-end loaded and yet FORE had always met earnings expectations, FORE's interim bookings were at best a "minor predictor" or whether or not FORE would meet earnings expectations. Glassman, 90 F.3d 633. Indeed, the latter depended on many unknown factors, including the amount of additional sales FORE would book and ship by March 31, and the amount of available backlog that would be included in revenue. Butler had no way of knowing the answers to these questions and accordingly had no way of predicting the March quarter results.

> not a reliable predictor of revenue. Regardless . . . bookings information clearly
> was the company's leading indicator of potential revenue for the quarter.

Thus, without any justification, and in apparent bad faith, the Commission pursued this meritless

claim while consciously – even brazenly – ignoring the weight of the evidence.

The fact that Butler could not have been tipped off to the March 1997 quarter's outcome

weeks ahead of time was confirmed by testimony at trial, where FORE's former COO Tom Gill

testified that FORE's revenue was "so unpredictable, it was scary," and – as this Court also noted

– further testified that the interim bookings information possessed by Butler would not allow one

to predict the end of quarter revenues. Transcript 9/22/04 at 30; Butler, 2005 U.S. Dist. LEXIS

7194 *18 (citing Transcript 9/22/04 at 6-7, 32-34).

In short, it should have been readily apparent to the Commission that the information

available to Butler at the time he made the trades in no way reliably indicated FORE's revenue

and earnings for the quarter ending in March of 1997, and to the extent it indicated anything,

such information made it appear likely that FORE would make its numbers for that quarter, just

as it had every quarter before. As such, it is plain that the Commission's claims lacked

substantial justification, and were actually entirely *un*justified. Nevertheless, the Commission

ignored these obvious infirmities in its case and persisted in pressing this matter for almost five

years.

### 2.    The SEC Lacked Substantial Justification For Alleging That The Information Available To Butler At The Time of His Trades Was Material

The interim financial results upon which the Commission premised this action were

clearly immaterial, and it had no substantial justification for insisting otherwise. Intra-quarterly

results are not material, even where they lag behind undisclosed internal projections, unless the

mid-quarter results indicate a "substantial likelihood that the quarter would turn out to be an

extreme departure from publicly known trends and uncertainties." Glassman v. Computervision

Corp., 90 F.3d 617, 631 (1st Cir. 1996) (quoting Shaw v. Digital Equipment Corp., 82 F.3d 1194,

1210 (1st Cir. 1996).

The Commission's contention that the information Butler possessed at the time of his

March 17 and March 24, 1997 trades was material was founded exclusively on the market's

reaction to the April 1, 1997 announcement of the earnings miss.  However, the Commission's

position in this regard was wholly without justification or reasonable basis.  As the Court stated:

> The Commission argues that the opening price of FORE stock on April 1, 1997 at
> $10.125, 'down 33% from its close the day before' was a significant market
> reaction to the announcement that it had missed Wall Street Estimates.  See SEC
> Response , p. 25.  The Commission further argues that '[t]his point is even more
> compelling when you consider the decline of [FORE's] stock price from March
> 17, 1997 . . . to the April 1, 1997 announcement.'  Id.  *These contentions are not
> only inconsistent with the facts of the case, they are contrary to law.*

Butler, 2005 U.S. Dist. LEXIS 7194 at 37 (emphasis added).

The Commission's position in this regard was ill conceived because it relied on the false

assumption that the information that was announced on April 1 was known or knowable on

March 17 or March 24, 1997.  In fact, it has been well established in this litigation that the

information available to Butler at the time of his trades was so incomplete and so limited that it

simply would not have provided him with the ability to more accurately predict the March

quarter's outcome than any member of the investing public.[10]  Simply stated, the vague,

---

[10]    See Butler, 2005 U.S. Dist. LEXIS 7194 at 24, n. 11 (holding that "*[d]espite the clear and
uncontroverted testimony of Mr. Gill and Mr. Maniglia*, the Commission insists that the information available to
Butler 'on or just before March 17, 1997 . . . would have dispelled the apparent predominant analyst belief . . . that

incomplete, uncertain information to which Butler had access on March 17 and March 24, 1997 was radically different than the concrete information that was announced to the public on April1, 1997.

The Court plainly placed the parties on notice that the market's reaction to the April 1 announcement could not be used to establish the materiality of the information Butler possessed at the time of his trades by striking the "event study" performed by the Commission's expert witness, Craig J. McCann.  Specifically, the Court held that "FORE's unfavorable public announcement on April 1, 1997 is at best secondary to the issues presented in this case, namely whether Mr. Butler traded on material, nonpublic information regarding FORE before April 1, 1997 and with the requisite scienter."  See Court's Order dated December 6, 2002.

Moreover, the Commission's reliance on the market's reaction to the April 1, 1997 announcement was unreasonable and unjustified because FORE's share price had more than fully recovered within just three days.  Of course, "the recovery of a substantial part of the decrease [in share price] during the first day following FORE's announcement and regaining the entire initial loss within three (3) days, 'negates any inference of materiality, because it indicates that investors quickly determined that the 'new' information was not material to their investment decisions." Butler, 2005 U.S. Dist. LEXIS 7194 at *37.

Finally, the Commission argued that:

the defendant's advantage over the market, by virtue of his advance knowledge concerning the information later revealed to the market on April 1, 1997, is glaringly manifest by the decline in the stock price from the date he learned

---

FORE would meet analyst published revenue and earnings expectations.' *Not only is such contention speculative, it is contrary to the clear weight of the evidence.*" (emphases added.))

11

information to the date on which the company's quarterly results were publicly disclosed.

Obviously, this argument was not only without substantial justification, but actually

incomprehensible. As the Court ruled:

> If the information upon which Butler made his trades was nonpublic, such information could not have affected the market. The market cannot possibly react to information that has not been disclosed. The Court finds the Commission's argument illogical, and such evidence of little value in determining the market effect of FORE's earnings shortfall.

Butler, 2005 U.S. Dist. LEXIS 7194 at *40.

Thus, it is plain that the Commission's position in arguing that the information Butler

possessed was "material" was completely without basis, and certainly lacked "substantial

justification".[11] As such, Butler is entitled to a recovery under the EAJA.

### C.    The SEC Repeatedly Acted in Bad Faith

Throughout this litigation, the Commission continued to advance arguments it knew to be

based on false factual contentions and seriously misstated principles of law, and engaged in other

blatant abuses. The fact that the Commission resorted to such tactics demonstrates the glaring

absence of substantial justification for this action, and shows that it often acted in bad faith.

---

[11]     The lack of materiality of any nonpublic information possessed by Mr. Butler at the time of his trades is made even more clear by reference to the facts that were available to the market. Such publicly known facts included public statements that FORE was experiencing a heavily "back end loaded" quarter, that sales in Asia and Japan were weak, and that there was significant risk that FORE could fall short of analyst estimates. Butler, 2005 U.S. Dist. LEXIS 7194 at *30-31. In light of these facts, the Court concluded – and the SEC should have known – that "the evidence supports a finding that the information available to Butler at the time he made the relevant trades did not significantly alter the 'total mix' of information made available to the public." Id. at *33. Thus, the Commission's case was that much more obviously lacking in substantial justification.

    **1.**     **The Commission Ignored the Fact that "Bookings and Revenue Information Available to FORE Management . . . Indicated to Everyone, Except the Commission, that FORE Was on Track to Meet Wall Street Expectations"**

As set forth _supra_ at Section II.B.1, and as the Court noted[12] in its decision on the merits, every witness ever to be deposed in this case or questioned at trial testified that he or she had expected that FORE would meet Wall Street expectations for the March 1997 quarter, just as it had for every quarter before that. Moreover, and again as the Court noted[13], an objective review of the bookings and revenue information available to Butler at the time of his transactions shows that FORE appeared to be in a superior position to make its numbers than it had been at the same point in the prior quarter, in which the Company had comfortably met expectations.[14]

The Commission steadfastly refused to recognize this manifest reality, electing instead to confuse the issue by raising the issue of missing "internal goals" (as distinct from market expectations), distorting the testimony of Michael Maniglia, and misrepresenting the nature and meaning of Tom Gill's March 18, 1997 email. _See_ Section II.B.1, _supra_, and Sections II.C.2 and

---

[12]     _See_ _Butler_, 2005 U.S. Dist. LEXIS 7194 at * 26 (holding that the "bookings and revenue information available to FORE management at or about the time of Butler's option trading indicated to everyone, except the Commission, that FORE was on track to meet Wall Street expectations.")

[13]     _See_ _Butler_, 2005 U.S. Dist. LEXIS 7194 at *14.

[14]     FORE had booked $64.3 million through March 14 and needed to book an additional $51.7 million to reach a total of $116 million, which, combined with $4m from backlog, would generate revenue of at least $120 million, an amount that Mr. Gill indicated was sufficient to exceed earnings expectations. Indeed, by March 17, FORE had booked 55% of the $116 million needed to meet expectations. By comparison, FORE had booked 56% of its orders by close of business on December 14 in the prior quarter (QTD bookings as of December 14 of $59,260,252, versus final quarterly bookings of $106,229,697) and went on to exceed earnings expectations.

In light of this data, Mr. Gill testified that FORE was in a better position to achieve its goals at the time of Butler's trades than it had been at the same point in the prior quarter, due to the difficulties presented by the holidays at the end of the December quarter. Transcript 9/21/04 181:20 - 182:3. Thus, at the time of Butler's trades, FORE's bookings and revenue status was at least as good as that of the prior quarter – a quarter in which FORE exceeded Wall Street expectations. The Commission knew this, but simply ignored it.

II.C.4, infra.  This refusal to recognize the obvious realities of this case can only be termed as having been in bad faith.  See Brown v. Sullivan, 724 F. Supp. 76, (W.D.N.Y. 1989) (citing Wells v. Bowen, 855 F.2d 37, 46 (2d Cir. 1988)) (other citations omitted).

### 2.    The Commission Falsely Claimed that FORE Reduced its "Internal Goal" on March 17, 1997

Tom Gill, FORE's COO at the time of the events at issue in this litigation, prepared an email on March 18, 1997 providing an analysis of his "best guess" of FORE's likely revenues for the March quarter.  See DX164.  Plaintiff repeatedly mischaracterized Gill's $120 million "best guess" as a reduction in FORE's internal revenue goal.[15]  See, e.g., SEC Memorandum of Law in Support of Motion for Summary Judgment on Liability at 23; SEC Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 6, 8; SEC Trial Brief at 5; SEC Response to Motion for Judgment at 17-18.  This contention simply flew in the face of reality.

The evidentiary record made it plain that both FORE's bookings goal and revenue goal remained constant throughout March, and were *never reduced*.  The $120 million figure discussed in Gill's email was, by its own terms and based upon Mr. Gill's sworn testimony at trial, an estimate – a "best guess" – of the revenue FORE would record for the March 1997 quarter.  Indeed, Mr. Gill's trial testimony was crystal clear in stating that the $120M figure was

---

[15]    In addition to misrepresenting the $120 million revenue "best guess" as a reduction in the company's internal revenue goal, the Commission also misrepresented the $4 million in backlog listed in the email as contributing to the $120 million revenue result as the sum total of FORE's available revenuable backlog.  See SEC Memorandum of Law in Response to Defendant's Motion for Summary Judgment at 17, n. 40.  In fact, FORE had shippable backlog of at least $6 million, which could have been (but was not) revenued in the March 1997 quarter.  See Thomas J. Gill Affidavit, filed herewith as Exhibit 2 to the Enright Declaration; DX 1 at SEC009280 (listing total ending backlog for March 1997 of $50,657,000, and total product backlog of $25,959,000).  Thus, it is plain that the Commission was aware that FORE had much more backlog available to be revenued than the $4 million called for in Gill's March 18, 1997 email, yet chose to ignore these facts and instead twist and misrepresent them to present a distorted picture to the trier of fact.

not "tied to any particular stated goal".  Transcript 9/21/04 85:20 - 86:10.  It was thus, obviously, not a revision of FORE's "internal goal".

The fact that the internal revenue goal remained constant and was not reduced is best evidenced by the March 1997 consolidated financial statement, which clearly indicated that FORE's internal revenue goal for the March quarter was $129,370,000 – not $120 million.[16] Similarly, a review of the daily bookings reports, admitted into the trial record as DX2 and DX9, makes it clear that FORE's bookings goal for the March 1997 quarter also remained constant at approximately $135 million.  As such, it is plain that the SEC's "reduced internal goal" argument was made without any reasonable basis and was advanced in bad faith for the purposes of confusing the trier of fact.

### 3.    The Commission Misrepresented the Testimony of Michael Maniglia

The Commission sought to distort the deposition testimony of Michael Maniglia by claiming that Mr. Maniglia testified that he believed that FORE Systems would fall short of the $120 million revenue "best guess" discussed in Gill's March 18 email.  See SEC Opposition to Defendant's Motion for Judgment at 17, n. 45.  However, the Commission's claims concerning Mr. Maniglia's testimony were plainly and obviously false.

In fact, Maniglia testified that he believed that FORE would fall short of its *internal* revenue goal for the quarter – $129 million.  See DX 85 at 128-29; 284. He further testified that given FORE's bookings and backlog status as of March 17, 1997, he would predict FORE to

---

[16]        See DX1 at SEC857, SEC862 (comparing $101 million actual quarterly revenue to $129 million "revised budget").

record revenues "probably in the $120 [million] range" or "slightly higher" for that quarter.  DX 85 at 191-92.

Moreover, the Commission's "internal revenue goal" contentions[17] in this case – in which the Commission argued that Butler somehow profited from knowledge that FORE would fall short of internal, never-disclosed sales goals, despite the fact that the market never had access to such information (before or after the quarter's end), and therefore could not act upon it – appear likely to have served strictly as a means for the Commission to attempt to confuse witnesses and the trier of fact.  Clearly, the Commission sought to mischaracterize the Maniglia deposition testimony for this same purpose, and it appears that confusion concerning the "internal goal" versus Wall Street expectations provided the primary means by which the Commission escaped summary judgment on its claims.  See Magistrate Judge Caiazza's Report and Recommendation on Cross Motions for Summary Judgment at 9-10 (citing evidence of FORE insiders knowledge that FORE would fall short of its internal goal for the March 1997 as creating a dispute of material facts sufficient to defeat summary judgment).[18]

### 4.    The Commission Ignored the Public Disclosures of FORE's Risks

The Commission argued that "there was no indication to the public that FORE Systems would, for the first time, not achieve Wall Street estimates for the fourth quarter of 1997."  See

---

[17]    See SEC Complaint at ¶¶ 10, 16; SEC Memorandum of Law in Support of Motion for Summary Judgment at 4;  SEC Opposition to Defendant's Motion for Summary Judgment at 16-17 (arguing that Butler knew that FORE would fall short of internal goals, and that somehow translated into knowing that FORE would fall short of analyst expectations); SEC's Statement of Facts in Support of its Response to Defendant's Motion for Summary Judgment at ¶ 21.

[18]    For this reason, the Court should not consider the denial of Butler's motion for summary judgment in this matter to signify any "substantial justification" for the Commission's claims.  See, e.g., Reich v. Walter W. King Plumbing & Heating Contractor, Inc., 98 F.3d 147 (4th Cir. 1996) (upholding grant of fees and expenses under EAJA despite the fact that the plaintiff had avoided summary judgment); Flores v. Shalala, 49 F.3d 562 (9th Cir. 1995) (same).

SEC Response to Defendant's Motion for Judgment at 20. The fact that this assertion was a

blatant falsehood is demonstrated by numerous publicly available news articles and analyst

reports disclosing FORE's risk of missing earnings expectations for the March 1997 quarter.

Nevertheless, the SEC completely ignored these disclosures, and chose instead to pursue

unsupported claims. These disclosures included the following:[19]

- "The Company has seen no improvement in its Japanese business since the
  Company's difficult December quarter, during which both European and
  other Asian markets made up the difference. FORE expects that Japan
  will represent only 5% to 6% of March quarter business as was the case in
  the December quarter . . . . With a few large projects yet to close, the
  pressure is on to deliver orders as we near the quarter end." See DX16.

- "There are a few large deals pending in the $3-$8 million range which are
  the swing factor in the current quarter . . . . [W]e note that longer sales
  cycles and deferred decisions on larger deals like this are the largest risk."
  See DX17.

- "FORE's quarter is back-end loaded due to large deals slipping into
  March. Most of the deals are in the enterprise market where we feel that
  increased competition has caused enterprise users looking to commit to
  large deals to put them to competitive bids in order to protect themselves. .
  . . FORE will have longer sales cycles as it increases its number of larger
  deals, lengthening the process." See DX19.

- "Specifically, with respect to three large deals (about $5 million each) that
  FORE was working on for the month of February, two have been pushed
  out to March (deals have yet to be awarded to FORE or competitors) and
  one deal was lost due to political considerations . . . . FORE's pipeline

---

[19]     To the extent that Plaintiff's argument relied on the proposition that information made public via a
company's press release is somehow different than that made public via analyst reports, see SEC Response at 19,
such an argument was plainly meritless. The source of public information makes no difference whatsoever to the
public nature of that information. See DeMarco v. Robertson Stephens Inc., 318 F. Supp. 2d 110, 120 (S.D.N.Y.
2004) ( "publicly available information concerning the issuer's stock, which was reflected in that stock price,
'included . . . analyst reports.'") (citing In re Worldcom, 219 F.R.D. 267, 301 (S.D.N.Y. 2003)); In re Infonet Servs.
Corp. Sec. Litig., 310 F. Supp. 2d 1106, 1116 (C.D. Cal. 2003) ( "[a]mong the public documents a court may
consider . . . are analyst reports when they are submitted to establish 'whether and when certain information was
provided to the market,'"); In re Convergent Technologies Sec. Litig., 948 F.2d 507, 513 (9th Cir. 1991),
superceded on other grounds by 15 U.S.C. § 78u-4 (2004) (analyst reports discussing company's risk factors left "no
doubt that the market was aware" of them).

remains strong enough to make the March quarter numbers but this clearly increases the risk that FORE could come up short on the revenue line since deal sizes are now larger, more strategic and more difficult to close." See DX20.

- "Shares of [FORE] remained under pressure for a second day as investors worried about the company's ability to at least meet expectations for its fourth quarter . . . . In comments Thursday and Friday, analysts pointed out that [FORE] would have a "back-end loaded" quarter, meaning that a large share of its business would come in at quarter's end." See DX25

Recognizing these disclosures, and the impact they had on FORE's share price, the Court found that "the investing public was aware in early March that there was a risk that FORE's March quarter results would fall short of Wall Street expectations." Butler, 2005 U.S. Dist. LEXIS 7194 * 30. Thus, it is plain that the SEC ignored these public disclosures in bad faith.

### 5. The Commission Instructed Its Staff Accountant, Paul Boeggeman, to Distort and Misrepresent the Evidence

SEC Staff Accountant Paul Boeggeman testified as a fact witness at trial, and stated that he had only analyzed the coincidence of market price movements for FORE options and telephone calls from Butler's telephone numbers directed to a specific, single line at Prudential securities, ending with the four digits 6599. Transcript 9/22/04 at 158:4-158:16. This testimony explicitly assumed that the only phone number at Prudential that Butler called to give instructions or place orders was this specific, and Boeggeman testified that Commission's counsel told him to limit his analysis of Butler's phone records to calls to that number for that reason. This assumption was not only false, but the Commission knew it was false, and intentionally directed its analyst to provide false and misleading testimony.

In fact, Butler routinely called several numbers at Prudential's Washington, DC offices, including separate extensions for his two brokers Chris Schrichte and Peter Barrett and for their

18

assistant Carmen Gonzalez.  Moreover, the Commission was well aware of Butler's relationship

with each of these individuals, and had full access to Butler's call records demonstrating that he

routinely called all three of them at different numbers – and actually called them on March 17,

1997.[20]  Thus, in directing Boeggeman to limit his analysis to only one number, the Commission

intentionally and directly instructed a witness to provide false and misleading factual testimony

to the Court, and to thereby attempt to mislead the trier of fact in order to support the

Commission's case and to prejudice Mr. Butler.[21]

### 6.    The Commission Pressured and Intimidated Witnesses

Certain witnesses testified to receiving late night "intimidating" evening phone calls from

Commission staff counsel, ostensibly to discuss the facts of this case.  See DX 74 at 166:13 -

169:21; DX 81 at 78:4 - 94:19.  However, these calls involved warnings to witnesses that they

should "not try and help" Mr. Butler, and seem to have been calculated to "pressure" and

"intimidate" the witnesses into providing testimony that would support the Commission's case.[22]

Indeed, the deposition of one of Mr. Butler's brokers, Peter Barrett, was cancelled after one of

---

[20]    These numbers included extensions ending with the four digits of 6599, 6534 and 6581.  See Transcript, 9/22/04 at 158:4-16, 159:6-161:11, and 181:13-15.  Mr. Boeggeman testified that he was instructed to ignore those calls, despite the fact that the Commission knew that they were calls from Butler to his brokers' offices on the day in question, in formulating his exhibits and preparing his testimony.  Id.

[21]    By only considering calls to this specific extension, the Commission evidently hoped to establish that Mr. Butler's call placing the order to buy puts and sell calls on March 17, 1997 could have only have taken place after the FORE sales conference call that was thereafter memorialized by Mr. Gill's March 18, 1997 email.  However, the relevant phone records in this case show that Mr. Butler placed numerous calls to Prudential's Washington, DC offices both before and after this conference call on March 17, 1997.  See Exhibit 3 to the Enright Declaration.

[22]    FORE Systems' former Vice President of North American Sales, Kirk Wrigley, testified that the Commission called him late in the evening and "intimidated", "pressured" and "led" him while questioning him about FORE Systems and without ever disclosing the nature of their inquiry.  DX 74 at 166:13 - 169:21.  Carmen Gonzalez testified that she was admonished repeatedly in pre-deposition ex parte conversations with counsel for the Commission to "tell the truth" and "not to try and help" David Butler, and that she felt "intimidated" and "stressed out" by the "tough tone" of these conversations.  DX 81 at 78:4 - 94:19.

19

these night-time calls apparently indicated that he would not provide testimony to the

Commission's liking.  See Affidavit of Peter Barrett (filed herewith as Exhibit 4 to the Enright

Declaration).

Plainly, this sort of bullying, fact-manipulating behavior would be improper for any

litigant, but is especially so for a governmental agency like the Commission.  The Court should

not countenance such conduct.  See Freeport-McMoRan Oil & Gas Co. v. FERC, 962 F.2d 45,

48 (D.C. Cir. 1992) ("We find it astonishing that an attorney for a federal administrative agency

could so unblushingly deny that a government lawyer has obligations that might sometimes

trump the desire to pound an opponent into submission.")

> ### 7.    The Commission Attempted to Conflate and Misrepresent the FORE Systems "Inside Information Policy" and "Insider Trading Compliance Program" Documents

The Commission was informed as early as March 17, 1998 that the "FORE Systems, Inc.

Inside Information Policy" and "FORE Systems, Inc. Insider Trading Compliance Program"

documents were separate and distinct documents, and the "Compliance Program" did not apply

to Butler.  See DX52 at SEC 021162.  Nevertheless, the Commission attempted, time after time

during investigatory[23] and trial depositions, and in its Complaint, to conflate inappropriately these

separate documents and misrepresent them to deponents as a single document.  See, e.g., SEC

Complaint at ¶ 18; DX 76 at 65:19 - 69:21.  See also Transcript 9/21/04 at 11:21 - 18:7.

Although Defendant was subject to FORE's "Inside Information Policy" but was *not* subject to

the "Insider Trading Compliance Program", it appears that Plaintiff's efforts to recast these two

---

[23]    The Commission conflated these documents during several investigatory depositions, in an apparent effort to prejudice the witnesses' perceptions,  including the pre-litigation investigatory depositions of Michael Maniglia, Tom Gill, and David Butler.

separate documents as one were designed to create the impression that Defendant was governed by a company policy that did not and never would apply to him, and thereby create an inference of guilt.

The Commission further argued that the bookings data to which Butler had access was material because "the company's own written insider trading policy specified revenue forecasts, among other things, as material information not to be disclosed to the public." See SEC Response to Motion for Judgment at 15; SEC Complaint at ¶ 18. This was simply false. The "Fore Systems, Inc. Inside Information Policy" said such information "*might be considered material*" – not that such information would necessarily be material. PX113 at 001 (emphasis added). Moreover, bookings reports and all of the other documents to which Butler had access were very much separate and distinct from "revenues forecasts". Revenue forecasts were prepared by Corine Metz, were never provided to Butler, and have never been introduced into evidence in this action. Transcript 9/22/04 220:8 - 220:23.

### 8.    The Commission's Pre-filing Investigation in this Matter was a Sham

The Commission's apparent willingness to stretch the truth, distort the evidentiary record and mischaracterize the law has come at high cost to Mr. Butler. Indeed, Mr. Butler has been hounded by the Commission since 1997, and this litigation has burdened Mr. Butler's career, his finances, and his mental health for the better part of a decade. The Court should not countenance this sort of behavior, and should hold the Commission to account for the harm their egregious behavior has inflicted.

Indeed, even beyond the unsupported, illogical and baseless claims the Commission has asserted, as discussed supra, it is plain that the Commission failed to conduct a reasonable good

21

faith investigation of the facts underpinning this matter.[24]  For example, the Commission refused to ask *any* FORE insider in *any* of its ex parte investigatory depositions the simple question of whether or not they had known or even suspected before the end of the quarter that the company was likely to fall short of Wall Street expectations for the quarter.  In deposing Mr. Butler himself[25], counsel for the Commission refused to even consider a package of exculpatory documents that Mr. Butler's counsel had sent them the prior month, and even lied and claimed they had not received those materials – a claim that is rendered highly suspect in light of the Federal Express records indicating otherwise.[26]  In fact, it was these same articles and analyst reports that the Court referenced in its Memorandum and Opinion on Butler's Motion for Judgment under Fed.R.Civ.P. 52(c) as having provided the evidence that "the investing public was aware in early March that there was a risk that FORE's March quarter results would fall short of Wall Street expectations."  Butler, 2005 U.S. Dist. LEXIS 7194 * 30.

The Commission further took investigatory depositions from Mr. Butler's brokers, Peter Barrett and Chris Schrichte, both of whom testified very clearly that they had repeatedly urged

---

[24]     The Commission's staff's *very first communication* with Butler's counsel, prior to a formal investigation even being opened, indicated very clearly that the Commission's staff had already pre-judged Butler and had already decided to pursue litigation against him.  Plainly, the Commission's "investigation" in this matter was a sham, the outcome of which was determined before it even began.  See Affidavit of Burton H. Finkelstein, Esq., filed herewith as Exhibit 5 to the Enright Declaration.

[25]     After this deposition had concluded, SEC staff counsel Michael Novakovic stated to Mr. Butler off the record, "[w]hen I'm through with this case, I'll never be on *your* Christmas card list."  See Exhibit 1 to the Enright Declaration at ¶ 9.  Plainly, this comment evinces a malice and hostility on the part of the Commission's counsel at a point before it had even concluded its so-called "investigation".

[26]     See Butler Affidavit at ¶¶ 2-9, filed herewith as Exhibit 1 to the Enright Declaration; PX 49 at 133:5 - 133:8 (transcript of Butler investigatory deposition of February 16, 2000 in which Butler stated that "I would very much like to discuss [at] a later date the information that we provided you and there should be more to come about a number of publicly available materials at a later time."); Exhibit 6 to the Enright Declaration (letter from Burton H. Finkelstein to Michael Novakovic dated January 14, 2000, enclosing exculpatory articles via Federal Express).

Mr. Butler to hedge his long position in FORE stock by entering into options transactions very much like those that gave rise to the Commission's claims in this litigation.[27]  Both testified that Mr. Butler had been discussing this hedge for weeks before the March 17 trade date.[28]  The Commission, however, ignored this exculpatory information and instead alleged that Butler's March 17 trades were spurred solely by inside information he learned that day during a conference call with FORE management.  Commission counsel also elected not to take evidentiary depositions from Mr. Butler's brokers, knowing that such testimony would contradict their baseless allegations.

It is clear that the Commission's investigation that preceded this litigation was not a good faith effort to ascertain the facts and determine if litigation was appropriate, but was rather a witch hunt premised upon willful ignorance and manipulation of the facts surrounding the trades at issue.  As such, it is clear that this entire litigation was undertaken in bad faith by the Commission.

## III.    BUTLER IS ENTITLED TO RECOVER HIS COSTS OF LITIGATION UNDER 28 U.S.C. § 2412(a)(1)

Federal law allows a prevailing party to recover costs and "other expenses," including reasonable expenses of expert witnesses and the reasonable cost of any study, analysis, or report necessary for preparation of the party's case.  28 U.S.C. § 2412(a), (d)(2)(A). Other compensable out-of-pocket expenses include photocopying; on-line legal research, Federal Express charges, and filing fees. See Chen, 842 F. Supp. at 600; National Ass'n of Mfrs., 962 F. Supp. at 199-200;

---

[27]    See DX 92 at 30:19 - 36:23; DX 91 at 18:19 - 19:18, 42:16 - 43:11.

[28]    Id.  See also DX 28.

23

<u>Truckers United for Safety v. Mead</u>, 201 F. Supp. 2d 52, 57 (D.D.C. 2002), <u>rev'd on other</u>

<u>grounds</u>, 329 F.3d 891 (D.C. Cir. 2003).

Butler incurred $216,824.39 in compensable expenses while defending himself in this

litigation.  <u>See</u> Bill of Costs, filed herewith as Exhibit 7 to the Enright Declaration.  These

expenses included: filings fees, photocopying costs for documents needed for the litigation,

expert fees and court reporter and transcription fees from depositions and trial.

Because Butler was the prevailing party in this litigation brought by an agency of the

United States government, these expenses are properly compensable under 28 U.S.C. §

2412(a)(1) and 28 U.S.C. § 1920.  As such, even if the Court finds that the Commission's claims

were substantially justified and declines to award Butler attorneys' fees under EAJA, the Court

should nevertheless enter an order awarding Butler a judgment for costs in the amount of

$216,824.39.

## IV.    <u>COMPUTATION OF FEES AND EXPENSES</u>

### A.    <u>Attorneys Involved</u>

This was a complex case, requiring sophisticated factual and legal analysis relating to

the federal securities laws, the securities markets, options and derivatives, trading strategies, and

sophisticated business, operations and financial concepts related to FORE Systems' business

performance at the time of Butler's trades.  Consequently, Butler had no choice but to seek

highly competent, highly sophisticated counsel with an extraordinary degree of expertise in such

matters.

As demonstrated by the firm resume filed herewith as Exhibit 8 to the Enright

Declaration, Mr. Butler's counsel, the law firm of Finkelstein, Thompson & Loughran ("FTL"),

24

are indeed highly sophisticated trial lawyers with broad experience and expertise in the field of complex securities litigation. Burton H. Finkelstein has been working in securities litigation for over 40 years, and was at one time Assistant Director of Enforcement with the Commission. Douglas G. Thompson, Jr. is an exceptionally accomplished trial lawyer with decades of experience in complex financial and securities litigation. All of FTL's lawyers responsible for this litigation brought an extraordinarily high degree of specialized knowledge and experience, and as such merit the fees charged in this matter. See Exhibit 8 to the Enright Declaration.

The specific attorneys within FTL primarily responsible for Mr. Butler's defense included Burton Finkelstein, Douglas Thompson, Donald J. Enright, Conor R. Crowley, and Michael G. Mclellan. The specific responsibilities of each in this matter can be summarized as follows:

- Burton H. Finkelstein serves as FTL's managing partner, and was responsible for initial investigation, strategizing and personnel assignment on the case. He spent 3.2 hours on this matter since its inception, and bills clients at a rate of $590 per hour.

- Douglas G. Thompson, Jr. is a senior partner with FTL, and served as lead trial counsel later in this case's life cycle. In this regard, Mr. Thompson was responsible for overseeing and directing all trial and strategic decisions after the summary judgment stage had passed. He further prepared witnesses and took direct and cross testimony from witnesses at trial. Mr. Thompson bills clients at a rate of $590 per hour, and spent 279.4 hours in litigating this matter.

- Donald J. Enright is a partner with FTL and served as senior trial counsel in connection with this matter. Mr. Enright oversaw the pretrial discovery and motions practice issues in this matter, and in this regard took (or defended) numerous depositions and drafted literally dozens of motions and briefs. He further prepared witnesses and took direct and cross testimony from witnesses at trial. Mr. Enright bills clients at a rate of $375 per hour, and spent no less than 556.6 hours in litigating this matter.

- Conor R. Crowley was an associate with FTL and served as assistant trial counsel in this litigation until his departure from the firm on March 5, 2004. Mr. Crowley spent 339.6 hours litigating this matter, and performed extensive factual and legal

analysis, prepared pleadings, motions and memoranda of law, oversaw the document production and review stage of discovery, and participated in numerous pre-trial depositions. At the time of his departure from the firm, Mr. Crowley's time was billed to clients at the rate of $310 per hour.

- Michael G. Mclellan is an associate with FTL. Mr. Mclellan performed legal research and factual investigation, and assisted trial counsel in preparation for trial. Mr. Mclellan bills clients at a rate of $225 per hour, and spent no less than 245.4 hours in litigating this matter.

All of Butler's counsel's time for which Butler requests compensation was actually spent in furtherance of this litigation and was actually billed to Butler. In fact, Butler's counsel have reduced the requested amount substantially by eliminating the billed time of several paralegals and law clerks who performed incidental work in connection with this matter. The billing rates set forth above are the normal rates for these professionals and represent reasonable market rates for similar services provided in the northeastern United States. The total lodestar for all such work performed in this matter is thus calculated to be $721,109.50, representing no less than 2,237.7 hours of attorney and staff time. See Enright Declaration at Exhibit 9.

Accordingly, Butler requests reimbursement of his full, market rate attorneys' fees in the amount of $721,109.5, as discussed further below. Alternatively, Butler seeks, at a minimum, $288,631.78, representing his compensable attorneys' fees under the EAJA rate cap limit.

**B.      Enhancement of Hourly Rates**

      **1.      Cost of Living Expenses**

The EAJA sets a $125/hour cap on attorney fees, subject to certain exceptions. One of the exceptions recognized by Congress as justifying an increased award is increased cost of living.

26

28 U.S.C. § 2412(d)(2(A). Cost of living increases are routinely granted and are normally based on the U.S. Department of Labor's Consumer Price Index ("CPI").[29]

The proper rate under the cost of living adjustment is "derived by adjusting that EAJA $125.00 rate by the . . . increase in the cost of living as measured by the CPI-All Urban Consumers from the March 1996 base period through" the date when the prevailing party actually prevailed. Walton, 177 F. Supp. 2d at 362. But see Dewalt v. Sullivan, 963 F.2d 27, 28 (3rd Cir. 1992) (holding that CPI-ALL is a proper rate adjustment index on a matter appealed from D.N.J.).

Using this methodology, counsel for Butler have calculated that the proper adjusted rate cap under EAJA for this matter would be $156.11, reflecting a 24.98% increase in the CPI-U since March 1996.[30] Applying this cap to Butler's counsel's time expended in this matter would produce a capped EAJA recovery of $288,631.78. However, for the reasons set forth below, the Court should decline to apply the EAJA rate cap at all, and award Butler his full market rate attorneys' fees.

---

[29]    See Walton v. Massanari, 177 F. Supp. 2d 359, 362 (E.D. Pa. 2001). See also Masonry Masters. Inc. v. Nelson, 105 F.3d 708, 710 (D.C. Cir. 1997) (citing Hirschey v. FERC, 777 F.2d 1,5 & n.24 (D.C. Cir. 1985)); Union of Concerned Scientists v. U.S. Nuclear Regulatory Comm'n, 840 F.2d 957, 959 (D.C. Cir. 1988); Chen v. Slattery, 842 F. Supp. 597, 600 (D.D.C. 1994) (noting that Congress intended EAJA cap to rise with the cost of living) (citing Wilkett v. I.C.C., 844 F.2d 867, 874 (D.C. Cir. 1988)).

[30]    The Consumer Price Index for All Urban Consumers, seasonally adjusted, published by the Bureau of Labor Statistics, had a March 1, 1996 value of 155.5. By April 1, 2005, the index value had risen to 194.2, a 24.89% increase. The seasonally adjusted index is normally used for relative comparisons because the data is adjusted for the usual price increases that occur every season, winter or summer type fluctuations. In this case, the non-seasonally adjusted data led to the same conclusions. The non-seasonally adjusted value for March 1, 1996 was 155.7, while the April 1, 2005 value was 194.6. This is an increase of a slightly higher 24.98%. Using this inflation rate, the $125 base figure is adjusted to a value of $156.11.

2.    **Other Special Factors**

a.    **The Commission's Bad Faith Merits an Award of Butler's Full Attorneys' Fees**

In addition to allowing for fee enhancements to account for increased cost of living, EAJA grants the Court discretion to consider other, unenumerated factors in determining an appropriate fee award. 28 U.S.C. § 2412(d)(2)(A). See also Action on Smoking and Health v. Civil Aeronautics Bd., 724 F.2d 211, 218 (D.C. Cir. 1984).  Specifically, where the government has acted in bad faith, the Court may award market-rate fees under EAJA without regard to the $125 per hour fee cap. See Action on Smoking and Health, 724 F.2d at 217 & n.26 (finding of bad faith allows plaintiff to claim fees under subsection 2412(b) of EAJA, which has no fee-limiting provision); Cazares v. Barber, 959 F.2d 753, 754 (9th Cir. 1992) (upon finding of bad faith, court may award reasonable market-rate fees); Smith v. Bowen, 867 F.2d 731, 736 (2d Cir. 1989) (same).

"Bad faith" includes governmental action undertaken "vexatiously, wantonly, or for oppressive reasons" in litigation. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y. 421 U.S. 240, 258-59 (1975). Bad faith fees are awardable when the government's position was "'entirely without color' and undertaken 'for reasons of harassment or delay or other improper purpose.'" Brown v. Sullivan, 724 F. Supp. 76, 78 (W.D.N.Y. 1989) (citing Wells v. Bowen, 855 F.2d 37, 46 (2d Cir. 1988)) (other citations omitted).

As set forth above in Sections II.B and II.C, the Commission's positions in this case were not only not substantially unjustified, but frequently reflected a marked absence of logic or evidentiary support.  In fact, the Commission repeatedly misrepresented and mischaracterized the

28

facts, the evidence and the law in pressing this action, made illogical and unsupportable

arguments, filed make-work motions that prolonged this litigation while making it ever more

expensive for Butler to defend himself, and even made overt efforts to pressure and intimidate

witnesses.  This behavior can certainly be described as "bad faith", and justifies an award of

Finkelstein, Thompson's full market rate fees without regard to the statutory hourly rate limit.

Thus, the Court should award Butler his full market rate attorneys' fees of $721,109.50.

> **b.    The Exceptional Delay in this Matter Merits an Award of Butler's Full Attorneys' Fees**

Courts have also specifically recognized litigation delay as a "special factor" warranting a

fee increase.[31]  Here, the delay in this action was pronounced and demonstrable.  Despite the fact

that the trades at issue took place in March 1997, and the Commission initiated this litigation on

September 14, 2000, this matter was not resolved until April 18, 2005.  Moreover, Defendant and

his counsel were consistently mindful throughout the course of this litigation of the need for a

prompt resolution in this matter, and were thus generally reluctant to seek extensions of time.  As

such, this delay was not the fault of the prevailing party, and as such the Court should award

Butler his full attorneys' fees without regard to the $125 rate cap.

> **3.    Calculation of Costs and Expenses**

---

[31]    See Wilkett v. Interstate Commerce Comm'n, 844 F.2d 867, 876 (D.C. Cir. 1988) (EAJA allows court to award fees in excess of statutory cap for delay where delay is exceptional and is not the fault of the prevailing party); Action on Smoking and Health, 724 F.2d at 119 (allowing upward adjustment under EAJA where court found that a year's delay in the litigation was directly attributable to agency action); Wonders v. Shalala, 822 F. Supp. 1345, 1347 (3d Cir. 1992) (noting that one of EAJA's purposes is to provide a disincentive to agencies to prolong the litigation process, and that awarding higher, fully compensatory fees better serve this purpose); Oklahoma Aerotronics, Inc. v. United States, 943 F.2d 1344 (D.C. Cir. 1991) (allowing enhancement for delay where delay was occasioned by the judiciary); Perales v. Casillas, 950 F.2d 1066, 1077 (5th Cir. 1992) (exceptional circumstances of delay not attributable to plaintiffs may constitute "special factor" permitting increase in statutory cap).

Butler's compensable costs and expenses, separate and apart from attorneys fees, in litigating this matter totaled $216,824.39. The breakdown of these costs are set forth at Exhibit 7 to the Enright Declaration. These expenses and costs are compensable under EAJA or, even if the Court finds that the Commission's case was substantially justified, under 28 U.S.C. § 2412(a)(1).

**CONCLUSION**

For the foregoing reasons, the Court should enter an Order directing the United States Securities and Exchange Commission to pay David Butler $721,109.50 as recompense for the full market rate of Butler's attorneys' fees under the EAJA (and the "bad faith" and "undue delay" exceptions to the EAJA rate cap provisions). Furthermore, the Court should enter an Order awarding Butler $216,824.39 for his costs and expenses of this litigation under the EAJA and/or 28 U.S.C. § 2412(a)(1).

Dated: July 14, 2005

Respectfully submitted,

Douglas G. Thompson
Donald J. Enright
FINKELSTEIN, THOMPSON
    & LOUGHRAN
1050 30th Street, N.W.
Washington, DC 20007
(202) 337-8000

Attorneys for David W. Butler