**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : |
| | : |
| | : CIVIL ACTION NO. 00-1827 |
| vs. | : |
| | : |
| DAVID W. BUTLER, | : |
| | : |
| Defendant. | : |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S AMENDED APPLICATION**
**FOR ATTORNEYS' FEES AND EXPENSES**

On August 5, 2005, defendant David W. Butler filed an amended application for an award
of attorneys' fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. 2412, arguing,
*inter alia*, that he is entitled to an award of fees because the litigation position of the United States
Securities and Exchange Commission ("Commission") in the underlying civil enforcement action
was not "substantially justified" and was pursued in bad faith. Butler's amended application
requests an award totaling $1,320,440.30, comprising $1,103,616 for attorneys fees and
$216,824.30 for costs and expenses. 1/

Butler's amended application should be denied. Butler has failed for a second time to
satisfy his burden of demonstrating that he is a party eligible to recover fees under EAJA as his
application does not establish that his net worth at the time the action commenced was less than

---

1/      Butler initially filed an application on July 15, 2005, requesting an award of $721,109.50
for attorneys' fees and $216,824.30 for costs and expenses which he alleges failed to reflect a
substantial amount of time billed on this matter.

$2 million.  Indeed, the evidence submitted indicates that Butler's net worth exceeded $2 million.

Assuming, *arguendo*, that this Court finds that Butler is eligible, he nevertheless is not entitled to

an award.  Under EAJA, a litigant is not entitled to fees when the agency was "substantially

justified" in bringing the action.  An agency may meet its burden by showing that there are

objective indicia that its case was justified, or by showing it had a "reasonable basis both in law

and fact" for its position.  Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Here, the district

court's denial of Butler's motion for summary judgment provides compelling objective evidence

that the Commission's litigation position was substantially justified.  Moreover, the

Commission's litigation position has been consistently grounded on provable facts and well-

established law.   Notwithstanding, if Butler is deemed entitled to an award, the amount must be

reduced considerably as his request is grossly inflated because it seeks fees for an unreasonable

number of hours calculated far in excess of the hourly rate set by EAJA as well as costs for which

he is not entitled to seek reimbursement.

FACTUAL BACKGROUND

Butler's application for fees derives from a Commission civil enforcement action against

him alleging violations of section 17(a) of the Securities Act of 1933, and section 10(b) of the

Securities Exchange Act of 1934 and Rule 10b-5 thereunder.  The Commission's complaint

alleged that Butler learned material, nonpublic information during internal teleconferences on

March 17 and March 24, 1997 which strongly suggested that his employer, FORE Systems, Inc.

("FORE Systems") would not be able to meet external revenue and earnings forecasts, and that

Butler, immediately upon terminating his participation in these calls, placed orders betting on a

drop in FORE Systems' stock price to protect himself from significant losses that he was virtually

- 2 -

certain to incur once the negative revenue and earnings news became public. The price of FORE

Systems' stock dropped 33 percent on April 1, 1997 after it was announced that its quarterly

earnings and revenue would be substantially lower than market expectations, allowing Butler to

profit by $367,513.83 on his trades.

The Commission filed its civil enforcement action on September 14, 2000. On December

10, 2001, Butler and the Commission filed motions seeking summary judgment. On July 20,

2002, Chief Magistrate Judge Francis X. Caiazza issued a Report and Recommendation opining

that all motions seeking summary judgment should be denied in light of the prevalence of material

issues of fact to be resolved by the trier of fact. Chief Judge Donetta W. Ambrose, to whom this

case was initially assigned, conducted a *de novo* review of the pleadings and documents in the

case, as well as the Report and Recommendation prepared by Chief Magistrate Judge Caiazza and

the objections raised thereto. On September 4, 2002, Chief Judge Ambrose issued a

Memorandum Order adopting the Report and Recommendation as the Opinion of the Court,

denying the motions seeking summary judgment.

This case was reassigned from Chief Judge Ambrose to Judge Cercone, and a bench trial

was commenced on September 20, 2004. At the close of the Commission's case, Butler moved

for judgment, which was granted in a Memorandum Opinion issued on April 18, 2005.

<u>ARGUMENT</u>

I.    BUTLER HAS FAILED TO SUSTAIN HIS BURDEN OF PROVING ELIGIBILITY
      UNDER EAJA.

Butler, as an applicant, bears the burden of demonstrating that he is eligible to an award

under EAJA. See NAACP v. Donovan, 554 F. Supp. 715, 718 (D.D.C. 1982) ("the burden of

proof is always on the applicant to prove entitlement to fees"). Because EAJA serves as a waiver of the government's sovereign immunity, its provisions must be strictly construed. See DeWalt v. Sullivan, 963 F.2d 27, 29-30 (3rd Cir. 1992). In order to be entitled to fees under EAJA, an applicant must show that his net worth did not exceed $2 million at the time the action was filed. See 28 U.S.C. 2412(d)(2)(B). An individual seeking an award of fees under EAJA bears the burden of establishing that he satisfies this net worth limitation. See Estate of Woll by Woll v. United States, 44 F.3d 464, 470 (7th Cir. 1994). An applicant's failure to satisfy this burden mandates the denial of an application. See United States v. Harper, 569 F. Supp. 602, 604 (E.D. Pa. 1983); King v. U.S., 1993 U.S. Dist. LEXIS 8999, *3 (S.D. Tex. June 18, 1993).

In this case, Butler has failed to provide sufficient documentation to prove that he meets the net worth limitation under EAJA. Butler has submitted an affidavit from his accountant reviewing documentation provided by Butler without auditing it in accordance with Generally Accepted Accounting Standards. Based on his limited review, the accountant stated that Butler's net worth as of September 14, 2000 (the date this action was filed) "was no more than $1,952.845.33 and is probably less". In other words, Butler claims that his net worth as of the date this action was filed was within approximately $47,000 of the maximum net worth threshold established by Congress. Attached to the affidavit is one page summary of purported assets and liabilities, with some supporting materials. However, among other infirmities, Butler provides no supporting documentation regarding the value of the Chrysler, Porsche and Acura automobiles listed as assets nor the figure of $30,000 included as an estimate of his personal possessions.

Similarly. the first item listed as an asset on the one page summary is a Wells Fargo Bank checking account for which Butler lists a value of $20,871.94. The corresponding account

- 4 -

statement attached to the summary shows that the figure of $20,871.94 actually represents an "average balance figure" for the account for the period September 12, 2000 through October 10, 2000. This same statement evidences a transfer of $100,000.00 out of the account on September 15, 2000, the day after this action was initiated, apparently to Butler's counsel. This account statement strongly suggests that Butler's summary understates his net worth as of the relevant date of September 14, 2000 by approximately $80,000, which would raise his net worth to over the $2 million statutory eligibility threshold, and preclude his ability to seek any recovery under EAJA. At the very least, this information raises serious doubts about the inclusion of the "average balance figure" for the account as the true measure of the funds in the account on September 14, 2000. 2/

Butler's failure to meet his burden of proving that his net worth did not exceed $2 million at the time the action was filed is dispositive, and precludes his claim. At a minimum, the Commission should be entitled to take discovery to determine whether Butler satisfies the net worth requirement of EAJA before considering his application. See Germano-Millgate Tenants Assoc. v. Cisneros, 855 F. Supp. 233, 234 n.2 (N.D. Ill. 1993) (court ordered discovery on net worth prior to determination of whether the applicant was otherwise entitled to fees).

II.    BUTLER IS NOT ENTITLED TO AN AWARD OF FEES UNDER EAJA BECAUSE
       THE COMMISSION'S POSITION WAS SUBSTANTIALLY JUSTIFIED.

EAJA is not an automatic fee shifting statute. It does not permit the award of fees to a

---

2/    The one page summary inexplicably includes the "minimum balance figure" of $4,190.34 for the second Wells Fargo Account listed among assets rather than the higher "average balance figure" of $20,367.38. The adoption of what appears to be an inconsistent, "results oriented" methodology for calculating the value of the two Wells Fargo accounts listed among Butler's assets by his accountant further undermines the credibility of his analysis.

party who prevailed in litigation with the government if the government's position was

"substantially justified." 28 U.S.C. 2412(d)(1)(A). 3/ The "substantially justified" standard is

satisfied when the government had a "reasonable basis both in law and fact" for its position when

it filed the action. Pierce v. Underwood, 487 U.S. 552, 565 (1988). 4/   A position "can be

justified even though it is not correct, and we believe it can be substantially * * * justified if a

reasonable person could think it correct." Id. at 566 n.2.  The Supreme Court in Pierce also noted

that certain "objective indicia" can be relevant in determining whether the government's position

was substantially justified.  Id. at 568-569.  Here, the Commission presented a reasonable factual

and legal basis for its claim that Butler violated section 17(a) of the Securities Act, and section

10(b) of the Exchange Act and Rule 10b-5 thereunder by knowingly or recklessly trading in the

stock of FORE Systems on the basis of material, nonpublic information about the company's

quarterly earnings expectations.  In addition, objective indicia indicate that the Commission's

---

3/      See H.R. Rep. No. 1418, 96th Cong. 2d Sess. (1980), reprinted in U.S. Code Cong. &
Admin. News 4984, 4990 ("The standard * * * should not be read to raise a presumption that the
Government position was not substantially justified, simply because it lost the case. Nor, in fact,
does the standard require the government to establish that its decision to litigate was based on a
substantial probability of prevailing."). See also FEC v. Rose, 806 F.2d 1081, 1087 n.13 (D.C.
Cir. 1986)("if a court adjudging entitlement to EAJA recovery were mechanically to infer from
the government's loss on the merits that its position was not substantially justified, it would
effectively extirpate this standard from the statute").

4/      See also Johnson v. HUD, 939 F.2d 586, 589 (8th Cir. 1991)("[t]he term 'substantially
justified' means 'justified in substance or in the main'")(quoting Pierce v. Underwood, 487 U.S.
at 565-566); Broussard v. Bowen, 828 F.2d 310, 314 (5th Cir. 1987) (government's position had
reasonable basis in fact, so fees denied even though plaintiff prevailed, should have prevailed,
and government's "position was hardly objective"); McDonald v. Schweiker, 726 F.2d 311, 316
(7th Cir. 1983)("[substantially justified] means that the government must have a solid though not
necessarily correct basis in fact and law for the position that it took in this action"); SEC v. Fox,
855 F.2d 247, 253 (5th Cir. 1988)(affirming denial of an EAJA award against Commission,
notwithstanding the fact that "SEC was soundly defeated at trial, and the case was not artfully
pleaded" because "the SEC introduced evidence of each element of a Rule 10b-5 violation").

position in this litigation was substantially justified.

    A.    Objective Indicia Confirm That The Commission's Case Was Substantially Justified.

      In Pierce, the Supreme Court found that indicia relevant in determining whether the government's position was substantially justified can include, *inter alia*, the stage at which the proceedings were resolved, 5/ and the views expressed by other courts on the merits. 487 U.S. at 568-569.

      As noted above, the Commission and Butler filed contemporaneous summary judgment motions, which were denied by Chief Judge Ambrose upon the recommendation of Chief Magistrate Judge Caiazza. Although he recommended denial of all motions seeking summary judgment because they failed to meet the relevant standard, Chief Magistrate Judge Caiazza nevertheless specifically noted that "the SEC's Motion for Summary Judgment comes closer to meeting this standard than does the Defendant's" motion seeking summary judgment. See Magistrate Judge's Report and Recommendation ("Mag. Judge's Report") (Dckt. 64) at 8. More specifically, Chief Magistrate Judge Caiazza noted that the Commission's motion "provides a detailed, fact-intensive recitation of circumstantial evidence supporting its allegations regarding [the] timing" of Butler's trades. Id. at 8. Similarly, the Chief Magistrate's Report stated that "[t]he SEC's evidence as to the timing of Mr. Butler's trades, as well as his contemporaneous statements (allegedly) regarding the financial instability of FORE, would easily permit a

_____

5/    See also SEC v. Fox, 855 F.2d at 252 ("[i]n deciding whether the government's litigation position was substantially justified, we must look at objective factors, such as the terms of relief, [and] the stage of the proceedings at which they were settled or decided"); FDIC v. Addison Airport of Texas, Inc., 733 F. Supp. 1121, 1125 (N.D. Tex. 1990)("In assessing substantial justification a court may consider so-called 'objective indicia' such as the stage of the proceedings at which the merits were decided . . .").

reasonable jury to conclude that he acted with the requisite mental state." Id. at 10.

That the Chief Magistrate Judge's Report noted that an extensive factual record supported the Commission's claims, and opined that "[b]oth parties' arguments for summary judgment implicate numerous questions of fact, require credibility determinations, and otherwise present questions that may only be properly resolved by the fact-finder" (id. at 7) provides strong objective evidence that the Commission's action was substantially justified. Courts have recognized that the fact that a case brought by the government has prevailed in the face of a summary judgment motion, and raises issues that must be determined by the trier of fact, provides a strong objective indication that the case was substantially justified for the purposes of EAJA. See, e.g., First Interstate Bank v. Purewell Inv., 1995 U.S. Dist. LEXIS 16101 (N.D. Cal. Oct. 18, 1995), aff'd, 76 F.3d 386 (9th Cir. 1996)("Although not dispositive, the survival of a motion for summary judgment is probative of the substantially justified standard.") 6/ See also Jackson v. Bowen, 807 F.2d 127, 130 (8th Cir. 1986) (stating that EAJA fees should not be awarded when "at least one permissible view of the evidence leads to the conclusion that the government has shown a reasonable basis in fact and law for its position.") 7/

---

6/    Neither of the cases cited in Butler's amended application contradict this point. At most, those cases indicate that a decision on a summary judgment motion is not dispositive on the issue of EAJA liability.

7/    Cognizant that the language of the Chief Magistrate's Report and its adoption by the District Court strongly contradict his argument that the Commission's litigation position was not substantially justified, Butler's amended application asserts that the Commission misrepresented certain facts in its motion for summary judgment, in effect alleging that the Commission committed fraud on the Court. The Commission emphatically rejects Butler's argument, which is completely undermined by his failure to raise such alleged misrepresentations in his opposition to the Commission's motions seeking summary judgment. Moreover, Butler did not raise this matter in his Response to Chief Magistrate Judge Caiazza's Report and Recommendation (Dckt.

(continued...)

B.    The Commission's Litigation Position Was Substantially Justified.

In order to establish that Butler engaged in unlawful insider trading, the Commission was obligated to prove that Butler: (1) was a "corporate insider", (2) that he purchased or sold securities, (3) that he was in possession of "material, nonpublic information" and (4) that he acted with "scienter". See SEC. v. Soroosh, 1997 WL 487434, *2 (N.D. Cal., August 5, 1997), aff'd, 166 F.3d 343 (9th Cir. 1998). There is no dispute in this case that Butler was a corporate insider who traded in the securities of FORE Systems. 8/ The Commission's litigation position that Butler traded while in possession of "material, nonpublic information" with the requisite scienter had a reasonable evidentiary and legal basis.

The evidence available to the Commission strongly indicated that Butler, at or before the time he made his trades on March 17 and March 24, 1997, possessed material, non-public information that FORE Systems probably would not meet analysts' revenue predictions for the fourth quarter of 1997, and knowingly or recklessly traded on this information. It is not disputed that, beginning on or before February 3, 1997, and at his own request, Butler began to receive daily bookings reports that included FORE Systems' order information by region for the day, week, month, and quarter-to-date; internal revenue goals for each region; and company-wide

---

7/(...continued)
75) filed on August 14, 2002.

8/    See Mag. Judge's Report at 6-7 ("There exists no meaningful dispute that Mr. Butler's status as regional sales vice president of FORE rendered him a 'corporate insider' under the applicable legal standards. * * * Nor is there any doubt that the Defendant 'purchased or sold securities.'").

totals. 9/ At this time, Butler also began attending weekly forecast meetings at which the

participants, including FORE Systems' regional vice presidents, its controller, and its chief

financial officer and chief operating officer, discussed the bookings to date in each region. 10/

Other topics discussed at these meetings included the plans and forecasts; competitive strategy;

amount needed to meet regional goals; order opportunities with a significant probability of closing

in the next two weeks to one month; the bookings outlook for the company for the remainder of

the quarter; bookings with a 50 percent chance of becoming an order; product shortages and/or

availability; product software issues; backlog in individual regions; and what the company needed

to book and ship in order to make, at least, internal revenue goals. 11/

     Butler learned additional material information during the March 17 teleconference,

including the regional and total company bookings to date; anticipated orders with a high

probability of becoming bookings; orders with a 50 percent chance of becoming bookings; and the

sum of these three figures, i.e., the anticipated bookings for the quarter. 12/ Participants also

discussed the company's revised revenue goal of $120 million, 13/ and an additional $8 million of

---

9/      Trans., 9/20/04, pp. 144:15-145:19; Trans., 9/22/04, pp. 211:11-212:19 and 213:7-
214:18. See also PX 52, PX 36 and PX 51.

10/    Trans., 9/20/04, p. 155:7-24. See also PX 30 and PX 33.

11/    Trans., 9/20/04, pp. 155:25-156:21. Trans., 9/21/04, pp. 56:11-57:11; 60:21-75:7. See
also PX 30; PX 33; PX 47 at pp. 216-17, 317-18; PX 49 at 80-83; and PX 92 at pp. 41-45.

12/    Trans., 9/20/04, pp. 163:23-166:8. See also PX 33.

13/    When asked whether his March 18, 1997 e-mail provided a roadmap to achieve revenue
goals, Gill responded "I would say it would be, if you want to use the term road map, to get to
120 million, not to 130 million. I mean it's clear from this that 130 million was not happening."
See Exhibit 5 to Declaration of Catherine Pappas in Support of SEC's Motion for Summary
(continued...)

revenue that the company needed to attain that reduced revenue goal: $4 million from backlog, and $4 million from additional, unanticipated, bookings (termed "creative" by the company). 14/

The material and nonpublic nature of this information is evidenced by the confidential treatment it was accorded by FORE Systems. 15/   Only a small, select cadre of FORE Systems insiders had access to the company's booking information, often on a "need-to-know basis." Internal dissemination of bookings information was often accompanied with a legend noting its confidential nature. 16/   Moreover, the bookings information was not disclosed to analysts, even though they regularly asked for it. 17/   See SEC v. Mayhew, 121 F.3d 44, 52 (2d Cir. 1997) ("a major factor in determining whether information was material is the importance attached to it by those who knew about it.").

In light of this evidence, the Commission reasonably believed that the information that Butler possessed was precisely the sort of information that a reasonable investor would consider important in deciding whether to invest – a reasonable investor could use this information in much the same manner as did FORE Systems' management:  to predict to a degree of probability the quarterly results and, more importantly, whether, *for the first time in its history*, FORE Systems

---

13/(...continued)
Judgment on the Issue of Liability ("Pappas Dec.") (Dckt. 25, 26) at 278.

14/     See PX 30; and PX 47 at pp. 202-217.

15/     Trans., 9/20/04, pp. 147:2-4 and 155:15-17; Trans., 9/21/04, pp. 37:5-12, 38:17- 39:5, 44:16-24, 45:9-46:14 and 75:8-76:10; Trans., 9/22/04, pp. 215:19-216:3.

16/     Trans., 9/21/04, pp. 44:19-24, 45:25-46:19.  See also PX 36, PX 52, DX 4, DX 7 and DX 8.

17/     Trans., 9/21/04, p. 37:5-20.  See also PX 64 at Bates no. 1800.

would miss quarterly earnings predictions.  See Glassman v. Computervision Corporation, 90

F.3d 617, 630-531 (1st Cir. 1996) (recognizing that investors may find information about a

company's internal projections and forecasts, including booking information, important).  Indeed,

armed with the bookings information to which Butler had access, a reasonable investor could have

drawn inferences about whether FORE Systems was likely to meet, exceed or fall below, Wall

Street revenue expectations.  See Shaw v. Digital, 82 F.3d 1194,1210 (1st Cir. 1996) ("[G]iven

that at any point in a quarter, the remainder of the period may not mirror the quarter-to-date, is

there a sufficient probability that unexpectedly disastrous quarter-to-date performance will carry

forward to the end of the quarter, such that a reasonable investor would likely consider the interim

performance important to the overall mix of information available?"); SEC v. Truong, 98 F.

Supp.2d 1086, 1098 (N.D. Cal. 2000) ("Even without knowing exactly how great an effect the

news [of a delay of a significant product] would have on earnings or when it would affect the

share price, the reasonable trader would know that the existence of a significant delay shaded the

odds in favor of a short position."). 18/  The materiality of this information is further

demonstrated by FORE Systems' agreement  shortly after the April 1 announcement to provide

analysts, *upon their request*, bookings information in the form of a book-to-bill ratio. 19/

    This Court acknowledged that Butler was privy to several categories of information

---

18/     Significantly, only one out of the thirteen analysts following the company decreased its
revenue and earnings expectations in March 1997 acting in reliance upon the publicly available
information (see DX 16, DX 17, DX 19 and DX 20) and then simply reversing an earlier increase
based solely on the negative information reported by the company on March 7, 1997.  See DX
19.  This evidence indicated that analysts still expected FORE to meet revenue goals in March,
1997.

19/     Book-to-bill ratio is calculated as bookings divided by revenue.  See Trans., 9/21/04, pp.
        37:5-40:2.

concerning FORE Systems' bookings, revenue goals, and sales forecasts (see Mem. Op. at 8), but nevertheless concluded that the information available to Butler was not "material" because it did not demonstrate that FORE Systems would fail to meet its revenue goal, relying primarily upon the testimony of Thomas Gill that participants in the March 17 teleconference believed that the company would in fact achieve revenue of $120 million. This Court further concluded that information that FORE Systems might not meet the market's revenue expectations was public: analysts' reports noting the risk that FORE Systems might not meet revenue expectations were disseminated throughout the marketplace prior to March 17, accounting for a drop in the price of the Company's stock price before March 17. Finally, this Court concluded that Butler's trades were similar to earlier trades he had made, and represented a reasonable effort to protect his financial interests in the event of a decline in the company's stock price.

     While acknowledging this Court's conclusions on these points, the Commission respectfully submits that it had a reasonable factual and legal basis for its position. The evidence presented at trial demonstrated that the consensus analyst estimate for FORE Systems' revenue for the quarter ending on March 31, 1997 was $122 million, $2 million above the reduced revenue estimate of $120 million that was established as a goal during the March 17 teleconference. While opining that this $2 million variation was "hardly an extreme departure from [the] public expectations" evidenced by the $122 million consensus figure, this Court specifically refused to find that the modest size of the variance "leads to the conclusion that the information known to Butler at the time of his trades was immaterial as a matter of law". See Mem. Op. at 14 (emphasis provided). Moreover, the evidence presented by the Commission demonstrated that FORE Systems' revised $120 million revenue goal was $6 million below the only analyst estimate that

Butler admitted he was aware of at the time. 20/  In light of this evidence, and as set forth above, the Commission's argument that Butler possessed material information was reasonable. Similarly, because the Commission reasonably believed that there was a material difference between the information available to the public and the information available to Butler, the Commission's argument that Butler possessed nonpublic information was also reasonable.

The Commission presented evidence which it reasonably believed would allow the trier of fact to conclude that Butler did not believe, and could not reasonably have believed, that FORE Systems would meet the revised revenue figure of $120 million established during the March 17 teleconference.  The Commission introduced the deposition testimony of Michael Maniglia, who, like the defendant, was a FORE Systems vice-president in 1997.  Mr. Maniglia testified that, although he did not have a specific recollection of the March 17, 1997 meeting, he remembered, based on the information available to him at the time, that he did not believe the company would meet the newly set internal revenue goal, and indeed would fall 20-25 percent short of that goal.

> Q:   [B]ased on this email, . . . .[did] you have a recollection at that point in time after attending this meeting as to whether or not you . . . you believed the company would meet its goals?
> A:   Yeah.  I mean, I do have a general recollection of what was going on at this time.
> Q:   Okay, what is that recollection?
> A:   There was no ifs, ands or buts in my mind that we weren't going to hit our goal.
> Q:   Okay.  And your goal being the internal revenue goal?
> A:   Correct.
> Q:   And do you know, have any recollection as to how much you were going to miss it by?
> A:   No.  I mean, we all had our own various guesses, but I felt that it would be a

---

20/    See PX 33 and PX 54.  Although there was no official revenue consensus at the time, one analyst reported the consensus at $122 million.  PX 54.

reasonably, you know, hefty number, 20, 25 percent. 21/

Mr. Maniglia also testified that, in his opinion, Mr. Gill was "reasonably inexperienced"

in terms of forecasting when he revised FORE Systems' revenue forecast to $120 million.

> Q:    How would you characterize Tom Gill's forecasting ability?
> A:    Well, Tom was reasonably inexperienced at that, this point in time, at least from
>       my perspective. Didn't have a lot of sales experience. Was more from a finance
>       background, and just didn't have a lot of experience at it. 22/

Finally, Mr. Maniglia confirmed, in response to a question posed by Butler's counsel, that

he did not believe that FORE Systems would achieve the revised revenue forecast of $120 million

for the quarter ending March 31, 1997.

> Q:    Okay. Now, based on your estimate where you would expect the company to end
>       up on bookings for that quarter, where would you expect the company to, given the
>       backlog information we reviewed earlier for March 1997, where – could you then
>       estimate what the company's revenues would be for this quarter?
> A:    Yeah. They could be in the 110 to 115 range. 23/

Mr. Maniglia's deposition testimony, admitted at trial, directly contradicted the testimony

offered by Mr. Gill that senior management at FORE Systems believed that the company could

meet the revised revenue figure of $120 million communicated during the March 17

teleconference. Mr. Maniglia's testimony raised substantial questions about whether Mr. Gill

possessed, or was perceived among senior management at FORE Systems (including Butler) to

possess, the experience to assert that the company could meet even the reduced revenue estimate

of $120 million as of March 17. Moreover, Mr. Maniglia's testimony raised grave doubts as to

---

21/    See, e.g., PX 92 at pp. 108-115, 127.

22/    See, e.g., PX 92 at p. 222.

23/    See, e.g., PX 92 at p. 224 (emphasis provided).

whether Mr. Butler himself believed that FORE Systems could reach the reduced revenue goal,

and offered important support (together with several emails authored by Butler during this time

frame) 24/ for the Commission's argument that Butler did not believe that the company would

achieve the reduced revenue goal. The Commission reasonably relied upon Mr. Maniglia's

testimony (as did Chief Magistrate Judge Caiazza and Chief Judge Ambrose in the denial of

Butler's summary judgment motion) and upon his credibility as a witness, 25/ intended to present

---

24/    A series of emails authored by Butler evidenced his escalating concern that FORE
Systems would not meet even the reduced revenue goal of $120 million. See Feb. 28, 1997
email from Butler ("[w]e need to get the sales teams really finishing strong in Q4 and get orders
in earlier rather than later. The factory will simply crumble if we continue the current hockey
stick.")(PX 32); March 11, 1997 email from Butler another Regional VP ("Are you [$%#&]ing
in your pants as much as me?")(alteration of expletive supplied)(PX 79); March 11 email from
Butler to Tom Gill and Michael Green (stating that he would "begin serious stuffing exercises
next week" because FORE Systems was "going to face a situation where [they] were running up
to a [bookings] shortfall at the end of the quarter")(PX 80); March 18 email from Butler to Kirk
Wrigley (stating that "[t]he conference call yesterday was bleak")(PX 35). These emails were
reviewed by Chief Magistrate Judge Caiazza, and formed the basis for his conclusion that
"contemporaneous statements (allegedly) regarding the financial instability of Fore, would easily
permit a reasonable jury to conclude [Butler] acted with the requisite mental state." See Mag.
Judge's Report at 10.

25/    As the Commission noted in its Opposition to Butler's *motion in limine* seeking to
preclude Mr. Maniglia's testimony (Dckt. 105 at 1, fn. 1) the Commission believed that Mr.
Maniglia's credibility was significantly enhanced *vis-a-vis* other former FORE Systems
employees because he had no identifiable bias when offering his testimony in this matter.
Several FORE Systems' officers, including Thomas Gill, were named as defendants in a
shareholder class action brought in this Court against FORE Systems and its officers alleging,
inter alia, that management had advance knowledge of the company's earnings and revenue
results, and improperly recognized certain transactions as revenue in the quarter ending on
December 31, 1996 in violation of accounting principles in order to satisfy the market place's
revenue expectations. See Bell, et al. v. FORE Systems, Inc., Eric Cooper, Michael Green,
Thomas Gill, Robert Sansom, Francois J. Bitz, Onat Menzilcioglu, Civil Action No. 97-1265
(W.D. Pa. 1997). Accordingly, the trier of fact was entitled to evaluate whether Mr. Gill's
deposition testimony (which predated the settlement of the shareholder's action) that he believed
FORE Systems would meet the revised revenue goal of $120 million in part because it had done
so in the preceding quarter was influenced and tainted by the fact that FORE Systems'
(continued...)

him as a live witness in its case in chief, and were prevented from doing so by a scheduling

conflict. 26/ To summarize, Mr. Maniglia's testimony directly contradicted the most important

defense raised by Butler (that all senior managers at FORE Systems believed the company would

meet its reduced revenue goal of $120 million), and provided a reasonable basis for allowing the

trier of fact to conclude that Butler executed the trades because he believed that FORE Systems'

stock would suffer a precipitous price decline.

Butler argued, and this Court accepted, that his trading history, including the trades which

formed the basis for the Commission's action, represented a continuing effort on his part to

hedge his position in FORE Systems' stock, which constituted a large percentage of his net

worth. In order to rebut Butler's assertion, the Commission presented testimony from its expert

witness, Dr. Craig McCann, who testified that Butler's transactions on March 17 and March 24

were atypical from Butler's prior trades. Specifically, virtually all of Butler's prior options trades

were placed to generate premium income and did not add to or detract from the risk of FORE

Systems' stock in Butler's portfolio, except for two trades that were designed to profit if the

stock price rose. See Trans., 9/20/04, pp.56-57. In contrast, the two March trades "had the effect

---

25/(...continued)
recognition of revenue was an issue in that case. Mr. Maniglia's testimony, and his credibility,
bore no such taint.

26/     The Commission acknowledges that Mr. Maniglia testified at one point that he believed
that FORE Systems would meet the reduced revenue goal of $120 million, and notes that this
Court apparently relied upon this portion of the transcript when it concluded that Mssrs. Gill and
Maniglia testified that FORE Systems would meet earnings expectations. See Mem. Op at 11-
12, fn. 11. Indeed, this ambiguity serves as a purported basis for Butler's meritless allegation
that the Commission acted in bad faith. In response, the Commission simply notes that the
totality of Mr. Maniglia's testimony establishes that he did not believe during March 1997 that
FORE Systems could achieve revenues of $120 million, a conclusion which doubtless fueled
Butler's aggressive efforts to have Mr. Maniglia's deposition testimony excluded from the trial.

- 17 -

of dramatically reducing the exposure to FORE Systems stock in [Butler's] portfolio. It was the equivalent to having sold somewhere between thirty-five and forty-three thousand of his sixty thousand shares." Id. As McCann testified, Butler only stood to profit on those trades if FORE Systems' stock price declined. Id. at 64-65. That suggests an attempt by Butler to profit from a sharp decline in the value of FORE Systems' stock rather than a long-term plan to manage risk as Butler alleged. Moreover, Butler's March trades were highly profitable, unlike Butler's previous options trades, which were largely unprofitable. Id. at 55. Thus, the Commission reasonably believed that Dr. McCann's testimony offered a credible rebuttal to Butler's argument concerning his trading history and his motivation for making the trades which form the basis for this action. The Commission also presented testimony to establish that Butler placed his trades immediately after the March 17 teleconference, which the Commission reasonably believed indicated that Butler placed his March 17 trades on the basis of information he learned during the teleconference, and believed this information was material. See Trans., 9/22/04, at pp. 96-141.

III.    BUTLER HAS NOT DEMONSTRATED ENTITLEMENT TO THE FEES AND COSTS REQUESTED IN HIS APPLICATION.

The Commission respectfully submits that Butler is not entitled to fees as he is not eligible under EAJA and the Commission was substantially justified in litigating this action. Assuming, *arguendo*, that the Court determines that the Commission was not substantially justified, Butler's amended application should nevertheless be denied.

A.    Butler's Argument That The Commission Acted In Bad Faith Is Meritless.

A prevailing party can rely on "bad faith" to obtain an award of attorneys' fees "only in exceptional circumstances." Havrum v. U.S., 204 F.3d 815, 819 (8th Cir. 2000). Courts have

- 18 -

held that "the bad faith exception under EAJA is a narrow one, typically invoked in cases of vexatious, wanton or oppressive conduct." Brown v. Sullivan, 916 F.2d 492, 495 (9th Cir. 1990). "An award of attorneys' fees under the bad faith exception is punitive, and the penalty can be imposed only in exceptional cases and for dominating reasons of justice." Id. A finding that the government's action was "substantially justified" precludes any recovery on a "bad faith" theory. McLarty v. U.S., 6 F.3d 545, 549 (8th Cir. 1993); Trucks, Inc. v. U.S., 763 F.2d 339, 341 (8th Cir. 1985). Assuming, *arguendo*, that the allegations of bad faith raised by Butler in an effort to justify his recovery of unreasonable fees which far exceed the statutory cap established by EAJA (see below at 21-24) were true, Butler still would be unable to satisfy this legal standard.

The Commission emphatically rejects Butler's wanton allegations that it acted in bad faith. Several of these allegations (e.g., that the Commission ignored evidence which indicated that FORE Systems was on track to meet market expectations; that the Commission falsely claimed that FORE Systems reduced its internal revenue goal from $130 million to $120 million and misrepresented the deposition testimony of Mr. Maniglia; that the Commission's prefiling investigation was a "sham" and ignored analysts' reports disclosing the risk that FORE Systems might fail to meet revenue expectations) have been addressed above. Indeed, most of these allegations were previously raised by Butler in his motion seeking summary judgment, and have either been considered and rejected by this Court or been rendered moot by this Court's denial of Butler's motion.

Butler's remaining allegations regarding bad faith are also groundless and, indeed, frivolous. Butler asserts that the Commission "instructed its staff accountant Paul Boeggeman to distort and misrepresent the evidence" by focusing his analysis on a single phone number used by

Butler's stockbroker. In fact, Butler testified during his investigative testimony that the telephone number upon which Boeggeman testified that he focused his efforts was the only telephone number he ever recalled using to contact his stock broker. 27/ Butler's assertion that the Commission "conflated" FORE Systems' policies is contradicted by the fact that the Commission did not offer evidence regarding the "Insider Trading Compliance Program" at trial.

Butler's allegation that the Commission improperly pressured and intimidated witnesses is demonstrably untrue. Kirk Wrigley, a former FORE Systems Vice President of North American sales, testified that he was very concerned that he would be "blackballed in the industry" if he were perceived to have helped the Commission in any way. 28/ Wrigley's testimony also confirms that to the extent he felt "intimidated" by the Commission, such feelings were caused by the simple fact that he had been contacted rather than by anything Commission personnel said to him during the conversation. 29/ Finally, Wrigley's testimony rebuts Butler's allegation that the Commission called him "late in the evening" as Butler alleges. 30/

_____

27/     See Exhibit 3 to Pappas Dec. (Dckt. 25, 26) at 105, 223.

28/     See DX 74 at 156 (Q: Do you recall stating to Mr. Novakovic that you were concerned about helping the Securities and Exchange Commission because you would be blackballed in the industry? A: Absolutely.")

29/     See DX 74 at 168 (Q: So I'm going to ask you again, could you please characterize, based on your recollection, Mr. Novakovic's manner and tone during the course of this conversation? [Objection noted] A: I felt intimidated. It's like the IRS calls you at night and starts asking you questions.")

30/     See DX 74 at 168 ("As much as I recall, I was – it was in the evening and I was relaxed. I was watching TV with my girls, and I got a call. And like I said, I probably had a couple of beers. I was, you know, totally done for the evening, and he called and was asking me about Fore Systems.") Michael Novakovic, the Commission attorney who contacted Mr. Wrigley, has confirmed that this conversation took place at approximately 7:00 p.m. in the evening.

The issue of the Commission's alleged attempt to intimidate Ms. Gonzalez served as a basis of Butler's motion in limine seeking to exclude her testimony (Dckt. 107), and has already been considered, and rejected, by this Court. Moreover, the testimony of Ms. Gonzalez directly contradicts Butler's characterization of the conduct of the Commission attorneys who contacted her, and confirmed that the Commission attorneys always emphasized that they wanted her to testify truthfully. 31/ Finally, the Commission cancelled Peter Barrett's *de bene esse* deposition after learning that Mr. Barrett would completely modify the testimony he previously gave more than two years earlier during the investigative phase, and reasonably concluded that he could not be called as a witness in the Commission's case. 32/ Accordingly, Butler has failed to identify a single instance where the Commission engaged in "bullying, fact-manipulative behavior."

> **B.**     **Butler Has Not Shown the Existence of a Special Factor To Justify Fees Higher Than the Statutory Maximum of $125 per Hour.**

EAJA provides that "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C.

---

31/    See PX 95 at 81, 86.

Q:    Did you feel in all – at all intimidated by this phone call?
A:    Maybe a little.
Q:    And what was it about this phone call that you found a little intimidating?
A:    Um I just. I – it sounds silly, but I thought that he was a little tough, just his – it sound silly, but just his tone.
*    *    *    *    *    *    *    *    *    *    *
Q:    Did you feel that the SEC's reminders to you to tell the truth were in any way an attempt to pressure you to conform your recollection of events to the version of events presented by Ms. Pappas and Mr. Novakovic on the first telephone call?
A:    No, no.

32/    Of course, this did not prevent Butler from calling Mr. Barrett as a witness.

2412(d)(1)(D)(2)(A).  Because the EAJA constitutes a limited waiver of the government's

sovereign immunity, it must be strictly construed in the government's favor.  See Friends of

Boundary Waters Wilderness v. Thomas, 53 F.3d 881, 887 (8th Cir. 1995).  In addition, by

enacting the above provision, Congress was aware that prevailing rates in a given market could

exceed the statutory maximum, but believed that reimbursement up to the statutory maximum

was sufficient.  See Pierce, 487 U.S. at 572.  Accordingly, this Court should be hesitant to exceed

the statutory maximum.

   Here, Butler asks this Court to award  the full fees charged by the Finkelstein firm in this

matter.  Specifically, he requests an award of $1,103,616 in fees for 4133.1 hours of work by

firm personnel, an amount reflecting hourly rates of up to $590 per hour, far in excess of the

$125 per hour statutory maximum.  Butler asserts that he is entitled to recover fees calculated so

far in excess of the statutory rate cap because the Commission acted in bad faith during this

matter, because "the delay in this matter was pronounced and demonstrable," and because his

counsel possessed "an extraordinarily high degree of specialized knowledge and experience."

See Amended Application at 29-30, 25. 33/

   Butler's argument that the Commission engaged in bad faith is meritless, as set forth

above.  His assertion that the adjudication of this matter was delayed implies, but offers no

evidence, that the Commission was responsible for the alleged delay.  Butler's failure is

understandable, since the Commission did not delay the litigation of this matter.  Indeed, the

---

33/    Alternatively, Butler seeks an award of $634,710.47 allegedly representing his
"compensable attorneys' fees under the adjusted EAJA rate cap limit."  See Amended
Application at 27.

primary cause of delay in this matter was the backlog of cases within this District and the reassignment of this matter.

Butler's assertion that he is entitled to payment of fees calculated well above the statutory rate is similarly unsupported by any case citation. Courts have uniformly held that counsel's expertise, acquired through practice in a particular subject area, only justifies an award of fees in excess of the statutory rate in circumstances where counsel possessed truly unique experience unavailable in the legal marketplace. In Pierce, the Supreme Court held that "the exception for 'limited availability of qualified attorneys for the proceedings involved' must refer to attorneys 'qualified for the proceedings' in some specialized sense, rather than just in their general legal competence. We think it refers to attorneys having some distinctive knowledge or specialized skill needful for the litigation in question – as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation." 487 U.S. at 572. Other courts have concluded that an EAJA claimant typically is not entitled to fees in excess of the prescribed statutory maximum based on counsel's expertise in a particular subject. See, e.g., Stockton v. Shalala, 36 F.3d 49, 50 (8th Cir. 1994) (experience in social security cases does not in itself warrant fee in excess of statutory rate); Raines v. Shalala, 44 F.3d 1355, 1361 (7th Cir. 1995) (same); Chynoweth v. Sullivan, 920 F.2d 648, 650 (10th Cir. 1990) ("incomparable expertise, standing alone, will not justify the higher rate"). Indeed, as the D.C. Circuit noted "[i]f expertise acquired through practice justified higher reimbursement rates, then all lawyers practicing administrative law in technical fields would be entitled to fee enhancements." See F.J. Vollmer Co. v. Magaw, 102 F.3d 591, 598 (D.C. Cir. 1996). Butler does not, and cannot, claim that the number of experienced attorneys capable of representing him in this matter was limited in any

- 23 -

way, and has not demonstrated entitlement to recover market rates which significantly exceed the

statutory rate prescribed under EAJA. 34/

> C.    Butler's Amended Application Reflects An Unreasonable Number of Hours
> Billed To This Matter By Defense Counsel.

Under EAJA, courts only "may award reasonable fees and expenses of attorneys". See 28

U.S.C. 2412(b) (emphasis provided). The 4133.1 hours for which Butler's seeks reimbursement

represents an unreasonable expenditure of attorney time. While it is impossible to analyze all of

the time billed by the Finkelstein firm in this matter, it is clear that the firm, unlike the

Commission, routinely sent two attorneys (typically Mr. Enright and Mr. Crowley) to cover the

depositions taken in this matter, a practice that significantly and unreasonably boosted the

amount of hours billed by the firm to this matter, and which should have been unnecessary in

light of Butler's representation in his application that "[a]ll of FTL's lawyers responsible for this

litigation brought an extraordinarily high degree of specialized knowledge and experience".

Amended Application at 25 (emphasis provided). Similarly, the expenditure of 508.8 hours by

Mr. Garcia, a financial analyst employed by the Finkelstein firm (accounting for $152,740 in

billings) appears to be unreasonable both in scope and redundant in light of Butler's retention of

an expert. The EAJA was never intended to serve as a mechanism to force the Government to

subsidize unreasonably aggressive billing practices by the defense bar.

> D.    Butler Improperly Seeks Reimbursement of Certain Costs.

Butler is not entitled to recover costs from the Commission because EAJA only allows

---

34/    It is counterintuitive and disingenuous for Butler to simultaneously argue that the
Commission's case was sufficiently groundless to evidence bad faith, but that only the firm he
retained as counsel had the expertise to successfully represent him.

recovery of costs "[e]xcept as otherwise provided by statute," and Section 27 of the Exchange

Act, 15 U.S.C. 78aa, expressly precludes recovery of costs against the Commission. See SEC v.

Kaufman, 835 F. Supp 157, 158-9 (S.D.N.Y. 1993). Thus, EAJA applicants cannot recover any

of the costs enumerated in 28 U.S.C. 1920 against the Commission. Id. at 159. Because Section

1920 includes copying costs, Butler cannot recover his copying costs of $42,044.92. Id.

Similarly, Butler is not entitled to recover $22,874.35 for a "Document Fee." Finally, in light of

this Court's December 6, 2002 Memorandum Opinion and Order (Dckt. 82) striking the parties'

expert reports, which concluded that "most, if not all" of the opinions stated in the report

prepared by Butler's expert were objectionable, Butler's request for $63,232.35 for "expert

services" should be denied, or at least significantly reduced.

CONCLUSION

    For the reasons described above, Butler's amended application for attorneys' fees should

be denied.

Dated: September 2, 2005                    Respectfully submitted,


UNITED STATES SECURITIES              RICHARD M. HUMES
and EXCHANGE COMMISSION               Associate General Counsel
100 F. Street, N.E.
Washington, DC                        SAMUEL M. FORSTEIN
        20549-9612                    Assistant General Counsel

Tel:  (202) 551-5140
Fax: (202) 772-9263
                                      TIMOTHY N. McGAREY
                                      Special Trial Counsel

## CERTIFICATE OF SERVICE

I hereby certify that I placed a true and accurate copy of Plaintiff's Opposition to

Defendant's Amended Application for Attorneys' Fees and Expenses in the U.S. Mail, postage

prepaid, this 2nd day of September, 2005, addressed to:

> Donald J. Enright, Esq.
> FINKELSTEIN, THOMPSON & LOUGHRAN
> 1050 30th Street, NW
> Washington, DC 20007

Timothy N. McGarey