# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. 00-1827 |
| Plaintiff, | Judge Cercone |
| v. | |
| DAVID W. BUTLER, | |
| Defendant. | |

## DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF AMENDED MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES

Respectfully submitted by:

Douglas G. Thompson, Esq.
Donald J. Enright, Esq.
FINKELSTEIN, THOMPSON & LOUGHRAN
1050 30th Street, NW
Washington, DC 20007
(202) 337-8000

Attorneys for Defendant

## INTRODUCTION

Defendant David W. Butler ("Defendant" or "Butler") was forced to incur legal fees and costs of $1,320,440.30 defending himself in a civil lawsuit that should never have been filed. As Mr. Butler's Amended Motion for an Award of Attorneys' Fees and Expenses and the supporting documents showed, Mr. Butler is entitled to have these legal fees and expenses reimbursed by the United States government under the Equal Access to Justice Act (the "EAJA") because: a) his net worth at the initiation of this litigation was well under the statutory threshold of $2 million; b) the United States Securities and Exchange Commission (the "SEC" or "Commission") brought this litigation without substantial justification; and c) the Commission acted in bad faith throughout this litigation, and this litigation was unduly delayed.

The Commission's Opposition to Defendant's EAJA motion rehashes arguments that have been considered and rejected repeatedly in this litigation. These arguments were rejected because they were manifestly and fundamentally at odds with the facts in the evidentiary record and with the law. This Court's decision upon Defendant's successful Motion for Judgment under Fed.R.Civ.Pro. 52(c) made this point clear, again and again, finding that the Commission's arguments were "illogical", "speculative", "contrary to law", "inconsistent with the facts of the case", and "contrary to the clear weight of the evidence". Unfortunately, Defendant is forced, once again, to respond to and refute these same falsities.

For these reasons, and as set forth more fully below, the Court should grant Defendant's Motion and order the Commission to pay Butler $1,103,616 in compensation for his legal fees, and $216,824 39 to reimburse his expenses incurred in connection with this litigation.

1

## ARGUMENT

## I.  BUTLER'S NET WORTH WAS WELL UNDER $2 MILLION

Butler has provided the Court with the Affidavit of Steven Olson, CPA, along with documentary exhibits establishing that his net worth was below $2 million on September 14, 2000. Nevertheless, the Commission argues that this is somehow insufficient, and that Butler has failed to establish that his net worth was less than the $2 million statutory threshold at the time of the initiation of this litigation. The Commission is incorrect.

"[A] district court is capable of determining an applicant's net worth based upon a sworn affidavit by the applicant's CPA, provided that the affidavit includes documentation of the applicant's liabilities and assets." Broaddus v. US Army Corps of Engineers, 380 F.3d 162, 168 (4th Cir. 2004). See also United States v. 88.88 Acres of Land, 907 F.2d 106, 108 (9th Cir. 1990) (holding that a sworn affidavit of a CPA averring that the applicant's net worth was under $2 million at the time of the initiation of the litigation will satisfy the EAJA). As such, Butler has provided sufficient documentation to the Court and to the Commission to satisfy the requirements of 5 U.S.C. § 504(b)(1)(B)(i).

The Commission further questions the value Butler's cars, personal items and Wells Fargo Bank account. Each of these is a non-issue.

The automobiles are listed in Olson's first affidavit at their acquisition price. See Affidavit of David W. Butler dated September 21, 2005 ("Third Butler Affidavit") at ¶¶ 2 - 6.[1] However, these values were actually overstated, because automobiles are depreciable assets.

---

[1]    This affidavit is filed herewith as Exhibit 1 to the Third Declaration of Donald J. Enright in Further Support of Defendant's Motion for an Award of Attorneys' Fees and Expenses (the "Third Enright Declaration").

Properly accounting for depreciation, the aggregate value of Butler's cars as of September 14, 2000 was actually $122,330, rather than the previously calculated total of $131,950. See Affidavit of Steve Olson dated September 21, 2005 (the "Second Olson Affidavit") at ¶ 7.[2]

Butler's personal items were almost worthless as of September 14, 2000. He owned no computers, no significant consumer electronics, and only used and/or extremely inexpensive furniture at that time. See Third Butler Affidavit at ¶¶ 7 - 12. Thus, the stated value of $30,000 for this personalty is actually a very generous valuation, as the true value of this property, properly depreciated, was likely approximately zero. Id.

Concerning Butler's Well Fargo account, Steven Olson, CPA, has calculated the net balance in that account as of September 14, 2000 to be $3,121.54, an amount $17,750.40 less than the average balance figure previously used. See Second Olson Affidavit at ¶ 4. This net balance figure properly reflects Butler's cash position as of September 14, 2000 because Butler owed his counsel $100,000 immediately upon being informed that the SEC was going to file this lawsuit several days earlier. In fact, while the $100,000 was wired to Butler's counsel on September 15, 2000, the obligation was incurred by agreement several days before September 14. See Affidavit of Burton H. Finkelstein dated September 20, 2005 (the "Second Finkelstein Affidavit")[3] at ¶¶ 2 - 4; Third Butler Affidavit at ¶ 13.

It is clear that Olson's initial net worth calculation very much erred on the side of conservatism by declining to include liabilities that could have brought Butler's reported net worth much lower and by valuing depreciable assets at their full acquisition price. Moreover,

---

[2]     The Second Olson Affidavit is filed herewith as Exhibit 2 to the Third Enright Declaration.

[3]     The Second Finkelstein Affidavit is filed herewith as Exhibit 3 to the Third Enright Declaration.

while the Commission argues that Olson has not properly applied Generally Accepted Accounting Principles ("GAAP"), he has averred that while this net worth calculation is not a financial statement, it was prepared and calculated in accordance with the principles of GAAP. See Second Olson Affidavit at ¶ 6.

Indeed, based upon the proper application of depreciation principles and based upon newly discovered documentation, CPA Steven Olson has further refined his analysis, and now is able to opine conclusively that Butler's net worth as of September 14, 2000 was actually no higher than $1,913,154.96, and probably less. See Second Olson Affidavit at ¶ 8. This newly calculated net worth figure reflects newly available documentation and the depreciation of Butler's automobiles. See Broaddus, 380 F.3d at 173 & n.10 (holding that "to determine the EAJA value of an asset, as is consistent with GAAP, its acquisition cost must be reduced by any accumulated depreciation of that asset".) See also Cont'l Web Press, Inc. v. NLRB, 767 F.2d 321, 322-23 (7th Cir. 1985) (same).

Based on the foregoing, it is manifestly clear that Butler's net worth at the time of the initiation of this litigation was well under the $2 million threshold. As such, Butler is entitled to an EAJA recovery, and the Commission's efforts to muddy the waters and open up a new, prolonged round of expensive discovery[4] should not be countenanced.

---

[4]     The Commission's request for discovery into Butler's net worth is inappropriate and should be nipped in the bud now. Indeed, "a 'request for attorney's fees should not result in a second major litigation.' Consequently, some informality of proof is appropriate." 88.88 Acres of Land, 907 F.2d at 108 (quoting Hensley v. Eckerhart, 461 U.S. 424 (1983)). See also Cont'l Web Press v. NLRB, 767 F.2d at 323 ("The proceeding to recover fees under the [Equal Access to Justice] Act is intended to be summary; it is not intended to duplicate in complexity a public utility commission's rate of return proceeding.").

## II.    THE SEC'S POSITION WAS NOT SUBSTANTIALLY JUSTIFIED

### A.    The Commission Bears the Burden of Establishing that Its Position Was Substantially Justified

While the Commission argues that "Butler . . . bears the burden of demonstrating that he is eligible for an award under EAJA"[5], in actuality it is the government that bears the burden of proving its position was "substantially justified" in accordance with EAJA.  See  Grossberg v. Barnhart, No. 04-2397, 2005 U.S. App. LEXIS 4950 *5 (3rd Cir. March 29, 2005).   Indeed, the "government's burden of showing substantial justification is a strong one and is not met merely because the government adduces 'some evidence' in support of its position." Washington v. Heckler, 756 F.2d 959, 961 (3d Cir. 1985) (citing Tressler v. Heckler, 748 F.2d 146, 150 (3d Cir. 1984)). In "order to meet its burden [of showing substantial justification], 'the government must show: (1) a reasonable basis in truth for the facts alleged; (2) a reasonable basis in law for the theory it propounds; and (3) a reasonable connection between the facts alleged and the legal theory advanced.'" Grossman, 2005 U.S. App. LEXIS 4960 at *5-6 (quoting Washington, 756 F.2d at 960).  As set forth below, and in Butler's Memorandum of Law in support of his Motion, the Commission cannot satisfy this burden.

### B.    The Court's Denial of Butler's Motion for Summary Judgment Does Not Indicate Substantial Justification of the SEC's Claims

The Commission argues that the denial of Defendant's Motion for Summary Judgment in this matter serves as an objective indicator[6] that its claims were substantially justified.  See SEC

---

[5]    Plaintiff's Opposition to Defendant's Amended Application for Attorneys' Fees and Expenses ("SEC Opp.") at 3.

[6]    Of course, the SEC's utter defeat at trial serves as a very clear "objective indicator" of the complete lack of substantial justification for its claims.  The Court repeatedly (and rightfully) noted again and again the specious nature of the Commission's claims, calling them "illogical", "speculative", "inconsistent with the facts

5

Opp. at 7-8. Of course, even the Commission concedes that a denial of summary judgment in no way precludes an award under EAJA. See SEC Opp. at 8, n. 6. See also Reich v. Walter W. King Plumbing & Heating Contractor, Inc., 98 F.3d 147 (4th Cir. 1996) (upholding grant of fees and expenses under EAJA despite the fact that the plaintiff had avoided summary judgment); Flores v. Shalala, 49 F.3d 562 (9th Cir. 1995) (same). Moreover, the Commission's argument fails, because the Court's denial of Defendant's Motion for Summary Judgment was premised on the Commission's distortions of the evidentiary record.[7]

The Commission avoided summary judgment by claiming that there were contested issues of material fact when, it turned out, there were none. The Commission manufactured a factual dispute by distorting the testimony of Michael Maniglia and pointing to "evidence" purporting to show that Butler knew that FORE would fall short of its *internal* goal for the March 1997 quarter. See, e.g., SEC Memorandum of Law in Support of Motion for Summary Judgment on Liability at 23; SEC Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 6, 8.

This argument was a red herring, because FORE's internal goals (as distinct from Wall Street expectations) were never released or disclosed to the market at any time before or after a

---

of the case", "contrary to law" and "contrary to the clear weight of the evidence". SEC v. Butler, 2005 U.S. Dist. LEXIS 7194, * 24, 37, 40, 42 (W.D. Pa. April 18, 2005). Defendant was not even required to present his defense, because the Commission had failed so utterly to present evidence of Butler's possession of any material adverse information concerning FORE Systems. Plainly, the Commission's claims were far from substantially justified.

[7]    It is further worth noting that the standard for the SEC to avoid summary judgment was a different, lower standard than the "substantial justification" standard to be applied on Defendant's EAJA motion. To avoid summary judgment, a plaintiff need only show that there is a "genuine issue as to any material fact", with all inferences drawn in the plaintiff's favor. Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 508 n.1 (3rd Cir. 2004). This summary judgment standard is thus far less onerous than the "substantial justification" burden imposed on the government by the EAJA, which "is a strong one and is not met merely because the government adduces 'some evidence' in support of its position." Washington, 756 F.2d at 961 (citing Tressler v. Heckler, 748 F.2d 146, 150 (3d Cir. 1984)).

quarter had closed, and therefore could never have impacted the price of FORE securities. See Section II.D.3, infra. Nevertheless, the Commission's sleight of hand was temporarily successful, and the Court premised its denial of summary judgment on this meritless "internal goal" argument. See Magistrate Judge Caiazza's Report and Recommendation on Cross Motions for Summary Judgment at 9-10 (citing evidence of FORE insiders knowledge that FORE would fall short of its internal goal for the March 1997 as creating a dispute of material facts sufficient to defeat summary judgment). Notably, the summary judgment decision never references *any* evidence that Butler knew that FORE was unlikely to meet ***Wall Street expectations*** for that quarter, which was the relevant consideration.

The Commission's briefs on the cross motions for summary judgment similarly overstated its case and misrepresented the evidentiary record in other ways as well. For example, the Commission's entire materiality argument was premised on the market's reaction to the April 1, 1997 news that FORE had fallen short of Wall Street expectations for the March quarter. See SEC Memorandum of Law in Support of Motion for Summary Judgment on Liability at 23; SEC Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 17-18 However, the "event study" upon which this argument was based was later stricken, and the Court explicitly held that the market's reaction on April 1 could not prove the materiality of the information Butler possessed two weeks earlier.[8] Without this baseless, irrelevant and misleading argument concerning the post-April 1 market reaction, Defendant likely could have been granted summary judgment on the materiality element.

---

[8]     Of course, FORE's stock began to rebound a mere 10 minutes after the market open on April 1, and was trading at prices higher than the March 31, 1997 closing price within just three days.

Another distortion of the factual record promoted by the Commission on summary judgment concerned certain emails from Butler during the March quarter which the Commission distorted and misrepresented in order to make them appear to indicate that Butler expected FORE to fall short of earnings expectations for the March 1997 quarter. Unfortunately, Magistrate Judge Caiazza appears to have adopted Plaintiff's demonstrably false interpretation of two documents. Specifically, Judge Caiazza drew an inference of Butler's mindset from Mr. Butler's March 11, 1997 email to another FORE regional vice president asking "Are you [XXXX]ing in your pants as much as me?" and Mr. Butler's March 18, 1997, e-mail stating "[t]he conference call yesterday was bleak."

In actuality, neither of these e-mails supported Plaintiff's position. Mr. Butler's March 11 e-mail expressed his concern over his possible termination from FORE due to an antagonistic relationship with Tom Armour, FORE's Vice President of Human Resources. Mr. Butler's March 18, 1997, was entitled "morale boost" and therein Mr. Butler explicitly indicated that he believed that "the worst [FORE failing to meet expectations] won't happen." Clearly, although Mr. Butler felt that the prior day's conference call had been "bleak" in tone due to its "wire brush" nature, he believed that FORE would be able to meet its quarterly revenue expectations. See Third Butler Affidavit at ¶¶ 28 - 33. Thus, it is plain that the Commission avoided summary judgment by distorting the evidentiary record and overstating its case – and continues to do so today.

For these reasons, and based on the fact that Defendant was granted judgment without having to even present a defense, it is clear that the Commission's success in defeating summary judgment falls far short of satisfying the Commission's burden of demonstrating the "substantial

8

justification" of its claims.  Thus, the Court should award Butler his attorneys' fees and costs under the EAJA.

**C.    The Commission's Position that Butler Knew that FORE Was Likely to Fall Short of Wall Street Expectations Was Not Substantially Justified**

**1.    The Testimony of Michael Maniglia Provided No Justification for the SEC's Position**

This Court explicitly found that the "information available to Butler at the time of his trades did not make it any more likely than not that FORE would fail to meet either internal or external revenue expectations."  _Butler_, 2005 U.S. Dist. LEXIS 7194 at * 22.  The Court further held that the "bookings and revenue information available to FORE management at or about the time of Butler's option trading *indicated to everyone, except the Commission, that FORE was on track to meet Wall Street expectations*."  Id. at * 26 (emphasis added).

Nevertheless, the Commission continues to ignore reality (and this Court's clear factual findings) and insist that the evidence shows that Mr. Butler knew that FORE was likely to fall short of Wall Street expectations for the March 1997 quarter.  SEC Opp. at 13-17.  In so insisting, the Commission primarily relies on the deposition testimony of Michael Maniglia.

Unsurprisingly, the Commission selectively quotes from Mr. Maniglia's deposition transcript, ignoring numerous clarifications that flatly contradict the testimony it quotes.  It is beyond question that Mr. Maniglia testified very clearly that: a) it was "much more difficult" to predict FORE's quarter-end results based on intra-quarter progress; b) given FORE's bookings and backlog status as of March 17, 1997, he would predict FORE to record revenues "probably in the $120 [million] range" or "slightly higher" for that quarter; and c) that there was no reason for FORE management to have expected that such a large amount of business would have "slipped"

9

out of the March 1997 quarter.[9]  Significantly, "[t]he Commission acknowledges that Mr. Maniglia testified at one point that he believed that FORE Systems would meet . . . $120 million . . . ."  SEC Opp. at 17, n. 26.  Thus, this is not even seriously in dispute.

To the extent that Maniglia testified that he had expected FORE to suffer any set back in the March 1997 quarter, he clearly testified that it was the irrelevant *internal* goal that he had expected FORE might miss – not Wall Street expectations.  See DX 85 at 53, 128-29, 284.  See also id. at 64 (testifying that Wall Street expectations were not discussed during the sales conference calls).  However, the Commission brazenly continues to misrepresent Mr. Maniglia's testimony with regard to the $120 million "best guess" in FORE CFO Thomas Gill's March 18, 1997 email, claiming that he testified that "he did not believe the company would meet the newly set internal revenue goal".  SEC Opp. at 14.  This continuing misrepresentation of the evidentiary record borders on sanctionable, and plainly evinces the Commission's ongoing bad faith.

In reality, Mr. Maniglia testified that "[t]here was no ifs, ands or buts in my mind that we weren't going to hit our goal."  Then a clarifying question made it plain exactly what he was talking about:

Q:    Okay.  And your goal being the internal revenue goal?

A:    Correct.

---

[9]       See DX 85 at 172, 191-92, 239, 242-244.

10

See DX 85 at 53, 128-29, 284.  Of course, FORE's internal revenue goal at the time of the March 17, 1997 sales conference call was $129,370,000, and remained constant throughout the quarter.[10]

Nevertheless, the Commission disingenuously continues to claim that there was a "newly set internal revenue goal" of $120 million, and it was this figure (rather than the true internal revenue goal of $129,370,000) that Maniglia expected to miss.  This argument does violence to every shred of evidence in this case, and insults the intelligence of the Court.  Indeed, FORE's financial records do not reflect any reduction in the Company's internal revenue or bookings goals during the March 1997 quarter, and Mr. Gill's trial testimony was crystal clear in stating that the $120 million "best guess" in his March 18, 1997 email was not "tied to any particular stated goal".  DX1 at SEC857, SEC862; Transcript 9/21/04 85:20 - 86:10.

Again, all of Maniglia's testimony should be considered in light of the fact that he clearly testified that it was very difficult to predict quarter-end outcomes, and that given FORE's bookings and backlog status as of March 17, 1997, he would predict FORE to record revenues "probably in the $120 [million] range" or "slightly higher" for that quarter.[11]  In sum, Mr. Maniglia's testimony was equivocal at best[12], and provided no support for the Commission's

---

[10]     See DX1 at SEC857, SEC862 (comparing $101 million actual quarterly revenue to $129 million "revised budget").

[11]     See DX 85 at 172, 191-92, 239.

[12]     Mr. Maniglia's testimony was frequently confused, and reflected a poor memory of the events in question relative to those of other witnesses.  He frequently contradicted himself, and was shown to have an extremely poor ability to predict a quarter's outcome based on intra-quarter progress.  See generally DX85.  Moreover, Mr. Maniglia specifically testified that the Commission had intimidated him in connection with his testimony.  See DX85 at 247-48.  Plainly, Mr. Maniglia was not a witness of such gravamen that his testimony could in any way be considered a valid counterweight to the avalanche of contrary testimony from witnesses with better grasps and recollections of the facts.

claims. Moreover, in light of the overwhelming and otherwise unanimous testimony[13] from every other FORE insider[14], Maniglia's self-contradictory testimony can hardly be construed to have provided "substantial justification" for the Commission's claims.[15]

### 2. Butler's Emails Do Not Indicate an Expectation that FORE Would Fall Short of Wall Street Expectations

The Commission continues to distort and misconstrue the evidentiary record by claiming that certain emails authored by Butler during the March 1997 quarter somehow show that Butler knew FORE was going to miss Wall Street expectations. In reality, these emails do not support the Commission's position at all. In fact, in apparently recognition of these emails' irrelevancy, the Commission did not even reference or elicit testimony concerning these emails at trial.

The Commission's argument fails to appreciate that not every potential concern from an employee's perspective translates into bad news for the Company, or for the Company's investors. Thus, Butler's concerns underpinning these emails – under-water employee options as a result of, and possibly being terminated – were largely unrelated to the possibility of FORE meeting or falling short of Wall Street expectations for the March 1997 quarter. See Third Butler Affidavit at ¶¶ 28 - 33. Indeed, when presented with these emails, Michael Maniglia testified

---

[13]     See Defendant's Corrected Memorandum of Law in Support of Amended Motion for an Award of Attorneys' Fees and Expenses at Section II.B.2.

[14]     The Commission argues that Mr. Maniglia's testimony was somehow more credible than others because he was not a defendant to any litigation relating to this quarter, while other witnesses were. SEC Opp. at 16, n. 25. This argument ignores that fact that Kirk Wrigley, Corrie Metz, Kevin Nigh, Gary Brunner, and Jeffrey McCarthy, all of whom testified that they did not expect FORE to fall short of Wall Street expectations for the March 1997 quarter, were never named as a defendant in any litigation relating to FORE Systems. See DX 74 at 148:7 - 148:16; DX 78 at 146:6 - 146:23; DX 80 at 9:9 - 9:23; and DX 86 at 31:15 - 33:23, 66:18 - 69:2.

[15]     Again, the "government's burden of showing substantial justification is a strong one and is not met merely because the government adduces 'some evidence' in support of its position." Washington, 756 F.2d at 961 (citing Tressler v. Heckler, 748 F.2d 146, 150 (3d Cir. 1984)).

that such emails "would tell me that Dave thought we were going to hit the number." DX 85 at 227:9 - 227:11.

Moreover, to the extent that any of these emails did indicate any concern about FORE's business, such concerns were plainly and obviously well within the scope of publicly available information. The evidentiary record in this matter is replete with analyst reports and news articles published prior to Butler's trades calling into question FORE's ability to meet expectations for that quarter and discussing other concerns about the Company.[16]

Because those emails were never relevant to FORE's likelihood of meeting or falling short of Wall Street expectations for the March 1997 quarter, and certainly could not evince any concern beyond those within the realm of public knowledge, they could not possibly provide substantial justification to the Commission's position. As such, Butler is entitled to an EAJA recovery.

### 3. FORE's Intra-Quarter Results Were an Extremely Poor Predictor of Quarter-End Results

Again, this Court explicitly found that the "information available to Butler at the time of his trades did not make it any more likely than not that FORE would fail to meet either internal

---

[16]    No later than March 11, seven days before Butler's hedge, the public market knew of the increased risk that FORE's March Quarter financial results would fall short of Wall Street expectations: "On FORE, Billimoria [a Hambrecht & Quist analyst] said *he is not optimistic that FORE can meet expectations for the current quarter.* * * * * He predicted *the traditionally back-end loaded quarter could come up short* . . . ." See DX24. Significantly, this Hambrecht analyst reduced his estimate of March quarter revenue from $122.8m to $110.5m and his rating of the stock to neutral from buy. See DX19. In addition to the March quarter's unusually high back-end loading, several analysts noted that:

- slow Asian sales were hurting FORE's chances of meeting expectations;
- "the pressure [was] on" because a "few large deals pending in the $3-$8 million range" which were "the swing factor in the [March] quarter."
- "[L]onger sales cycles and deferred decisions on larger deals like this [were] the largest risk."

See DX16-25. See also Defendant's Corrected Memorandum of Law at Section II.C.4.

or external revenue expectations." Butler, 2005 U.S. Dist. LEXIS 7194 at * 22.[17] Indeed, the Commission itself has conceded that there is ample factual evidence in the record establishing the fact that intra-quarter results were an extremely poor predictor of quarter-end outcomes. See SEC's Memorandum of Law in Support of its Motion for Summary Judgment on Liability at note 17 (admitting that "[m]uch of the factual record developed by defendant in this case is devoted to various former FORE Systems' employees stating that bookings information was not a reliable predictor of revenue.") This was so because, by virtue of FORE's consistently back-end loaded business cycle, a large plurality, and sometimes a majority, of FORE's quarterly sales were recorded in the final days of the quarter.[18]

The Commission's primary argument in support of its position has been that "bookings turn into revenue", and that revenues were historically anywhere from 90% to 110% of bookings for any given quarter. See, e.g., SEC Pretrial Narrative at 6. This argument fell far short of giving rise to a "substantial justification" for the Commission's position.

First, Butler could not possibly have known on March 17 what the FORE's quarter-end bookings would be. Again, the back-end loaded nature of FORE's business cycle absolutely precluded such knowledge. Second, with revenues coming in at anywhere from 90% to 110% of

---

[17]     This fact was confirmed by testimony at trial, where FORE's former COO Tom Gill testified that FORE's revenue was "so unpredictable, it was scary," and – as this Court noted – further testified that the interim bookings information possessed by Butler would not allow one to predict the end of quarter revenues. Transcript 9/22/04 at 30; Butler, 2005 U.S. Dist. LEXIS 7194 *18 (citing Transcript 9/22/04 at 6-7, 32-34).

[18]     By close of business on March 14, 1997 FORE had booked 49.89% of it quarterly goal. By comparison, as of December 14, FORE had booked 48.4% of the internal goal. DX2; DX9.

14

bookings, this range would be so broad as to be essentially useless, even if Butler had been able to somehow divine the quarter end bookings.[19]

In short, nothing in the Commission's Opposition brief calls into doubt the evidentiary record and the Court's conclusion of fact that FORE's intra-quarter bookings data was nearly useless for predicting the Company's quarter end revenues.  This issue was absolutely plain to anyone who cared to examine it – except, apparently, the Commission.  As such, the Commission's position that Butler knew that FORE was likely to fall short of Wall Street expectations for the March 1997 quarter was far from substantially justified, and was actually essentially entirely baseless.

> **4.     To the Extent FORE's Intra-Quarter Result Indicating Anything in March 1997, they Indicated that FORE Would Meet or Exceed Expectations**

To the extent that FORE's interim bookings data indicated anything at the time of Butler's trades, it indicated that FORE would meet or exceed Wall Street estimates for the March 1997 quarter.  See, e.g., Transcript 9/22/04 34:24 - 35:18; 221:3 - 221:7; 9/21/04 181:20 - 182:3.  As of the March 17 conference call, FORE had booked $64.3 million through March 14 and needed to book an additional $51.7 million to reach a total of $116 million, which, combined with $4m from backlog, would generate revenue of at least $120 million, an amount that Mr. Gill

---

[19]      Had FORE's revenues for the March 1997 quarter been 110% of even the unexpectedly disappointing final March quarter bookings, FORE would have recorded revenues of $121 million and met or exceeded Wall Street expectations.  As it actually happened, revenues were only a little more than 90% of bookings in the March 1997 quarter.  Thus, the 90% to 110% range would allow for a range of outcomes varying from a very good quarter to a disaster.  Not even the Commission argues that Butler could have known where within this range FORE's revenues would fall at the time of his trades.

15

indicated was sufficient to exceed earnings expectations.[20] Indeed, by March 17, FORE had booked 55% of the $116 million needed to meet expectations. By comparison, FORE had booked 56% of its orders by close of business on December 14 in the prior quarter (QTD bookings as of December 14 of $59,260,252, versus final quarterly bookings of $106,229,697) and went on to exceed earnings expectations.[21]

In light of this data, Mr. Gill testified that FORE was in a better position to achieve its goals at the time of Butler's trades than it had been at the same point in the prior quarter, due to the difficulties presented by the holidays at the end of the December quarter. Transcript 9/21/04 181:20 - 182:3. At the time of Butler's trades, FORE's bookings and revenue status was at least as good as that of the prior quarter – a quarter in which FORE exceeded Wall Street expectations. Butler had no information at the time of his transactions that the same result would not be achieved for the March quarter. As such, the Commission's position in this litigation has been far from substantially justified.

---

[20]    See DX2, DX 9 and DX164. See also Transcript 9/21/04 195:13-19. Remarkably, the Commission continues to misrepresent Mr. Gill's $120 million "best guess" for the March 1997 quarter as a "revised $120 million revenue goal". See SEC Opp. at 13. Again, the $120 million "best guess" contained in Gill's March 18, 1997 email was an estimate of FORE's actual quarter-end revenues, not a goal.

[21]    Similarly, whereas FORE had publicly disclosed in early March that it expected a 65% back-end loaded quarter (and therefore necessarily had only booked 35% of its goal as of March 1), by close of business on March 14, FORE had booked 49.89% of it quarterly goal. By comparison, as of December 14, FORE had booked 48.4% of the internal goal. DX2; DX9.

**D.**   **The Commission's Position that the Information Butler Possessed Was Material Was Not Substantially Justified**

**1.**   **Intra-Quarterly Results Are Immaterial Where They Do Not Strongly Indicate Quarter-End Results Varying Dramatically from Market Expectations**

Intra-quarterly results are not material, even where they lag behind undisclosed internal projections, unless the mid-quarter results indicate a "substantial likelihood that the quarter would turn out to be an extreme departure from publicly known trends and uncertainties." Glassman v. Computervision Corp., 90 F.3d 617, 631 (1st Cir. 1996) (quoting Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1210 (1st Cir. 1996). See also SEC v. Hoover, 903 F. Supp. 1135, 1143-44 (S.D. Tex. 1995).

The Commission failed at trial, and continues to fail, to show any reason why Butler or anyone else within FORE would perceive such a "substantial likelihood" of an "extreme departure". Indeed, the Commission's entire case appears to have been based upon the notion that Butler "knew" that FORE would record revenues of approximately $120 million for that quarter – a figure only 1.6% off from the purported consensus analyst revenue projection referenced by the.[22] Far from an "extreme departure" from expectations, this revenue figure was well within the range of expectations, and would have been more than sufficient to meet or exceed Wall Street earnings expectations for the March 1997 quarter.

Indeed, while Plaintiff has trumpeted a "consensus" Wall Street revenue estimate of $122 million for the March quarter, the most contemporaneous information available to the market at the time of Butler's trades was Hambrecht & Quist's downward revision of revenue expectations

---

[22]   See, e.g., SEC Trial Brief at 5; SEC Response to Defendant's Motion for Judgment at 17-18.

to $110.5 million. DX19. $120 million was therefore very much within the "range of results that the market anticipated based on then-available information." Shaw, 82 F.3d at 1210.

Similarly, the evidence demonstrates that Wall Street's consensus earnings expectations for the March 1997 quarter were $0.15 per share. See DX16-DX19; DX54. Mr. Gill testified that the $120 million revenue FORE management was expecting at the time of Butler's trades would have been enough for the Company to meet the internal earnings goal of $0.17.[23] Obviously, earnings of $0.17 per share would have exceeded Wall Street expectations of $0.15.

Thus, it is clear that the internal results to which Butler had access were not an "extreme departure" from public expectations. Far from it, they were very much in line with the consensus estimates. As such, it is quite clear that the Commission's claims lacked substantial justification.

> **2.     The Market's Reaction to FORE's April 1 Announcement Could Not Indicate Materiality of Information Available on March 17, but Did Indicate that Such Information Was Immaterial**

The trial record makes it clear that the information Butler possessed at the time of his trades indicated that FORE was likely to record revenues of around $120 million for the March 1997 quarter. See, e.g., DX164. The record is equally clear that the final quarterly revenues were much lower than was anticipated within FORE at the time of Butler's trades, reporting only $101 million -- a figure 16% lower than management's "best guess". Nevertheless, Plaintiff insisted that the market's reaction to the disclosures of April 1, 1997 somehow served to

---

[23]     Transcript 9/22/04 12:6 - 13:1 (testifying that $120 million in revenues would have been sufficient for FORE to achieve its internal earnings goal); DX1 at SEC858, SEC 862 (stating that budgeted net income for the March quarter was $0.17 per share). Mr. Gill further testified that the company was judged by earnings, not by bookings. Transcript 9/21/04 209:18 - 209:23.

establish the materiality of the very different information that Butler possessed on March 17 and March 24, 1997.

The SEC tried a similar strategy in the <u>Hoover</u> case, where the market later learned of news that was worse than what the defendant knew at the time of his trades. This argument failed in <u>Hoover</u>, because the "market reaction to the much worse, later projection does not support the Commission's argument that the information Hoover had on August 23, 1991 was material as a matter of law." <u>Hoover</u>, 903 F. Supp at 1147. For the same reasons, this argument failed here.

Although the market's reaction to much worse later news could not have served to establish the materiality of Butler's prior, more benign knowledge, it can – and in this case, did – strongly indicate that the information Butler possessed at the time of his trades could not have been material. Indeed, it is clear that revenues of $101 million is a much worse outcome than FORE management's $120 million "best guess". If the much worse $101 million result was not material, then the much more optimistic $120 million "best guess" *simply could not have been material*.

That was precisely the case here. Although Plaintiff argued that the market "opened that day at $10.125, down almost 33% from its close the day before," it failed to note that the price quickly rebounded throughout the rest of the day, reaching $11 within ten minutes, $12 within an hour (10:27), $13 by 3:45 pm, and an intra-day high of $13 3/8, just 10.8% below the March 31 close of $15. DX320. Over the next three days, the price continued to rebound, hitting an intra-

19

day high of $16 1/8 on April 4, *or 7.5% higher than the pre-announcement close of $15.*

DX15.[24]

Mr. Gill testified quite clearly on this issue, stating that the April 1 disclosure was a "non-event from a shareholder – from a Wall Street perspective." See Transcript 9/21/04 208:7 - 208:8. He further testified:

> Typically, if companies surprised investors with an announcement, the stock price would drop precipitously. In this case the price did not drop precipitously. In fact, I think within the next day or two it might have gone up.

See Transcript 9/22/04 61:13 - 68:18.

As a matter of law, and consistent with Mr. Gill's testimony, where the price recovers to its pre-announcement level within five to ten days after the disclosure of new information, that information is immaterial. The decision in Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc., 821 F. Supp. 212, 220 (S.D.N.Y. 1993), is squarely on point:

> That the price of Westinghouse common stock recovered to its pre-announcement level within five trading days of February 27, 1991 and traded without dramatic fluctuation for a substantial period thereafter shows that the market did not change its valuation of Westinghouse common stock because of the February 27, 1991 announcement.

> To again quote Mr. Gill, it was clear from the market reaction that the April 1

_____

[24]    While the FORE price more than fully recovered within a few days after the April 1 announcement, by contrast it never recovered to the $30 price level that preceded the March 7 public warnings of an earnings miss, or even the $22 price level that prevailed when Butler initiated his hedge position on March 17. DX15.

announcement was an immaterial "non-event".[25] Thus, because even the $101 million result was greeted by investors with a collective shrug, information indicating that the Company was likely to record revenues of around $120 million obviously could not have been material. As such, it is clear that the Commission's position in this litigation was not substantially justified, and Butler is entitled to reimbursement of his attorneys' fees and expenses under the EAJA.

### 3. FORE's Intra-Quarter Progress Toward Internal Goals Was Immaterial as a Matter of Law

A fact is material for the purposes of the federal securities law if "there is a substantial likelihood that [the] fact would have been viewed by the reasonable investor as having significantly altered the 'total' mix of information made available." TSC Indus. v. Northway, Inc., 426 U.S. 438, 449 (1976). See also Basic v. Levinson, 485 U.S. 224, 231 (1988). Here, because information about FORE's internal goals was *never* released to the public (before, during or after the quarter), the market could never have considered those goals, nor based any investment decision thereupon. As such, information about the Company's progress toward achieving (or missing) its internal goals was utterly and completely irrelevant and immaterial.[26]

---

[25]    Moreover, market analysts maintained their positive investment ratings after the April 1 announcement -- a clear indicator that the April 1 news did not significantly change their view of FORE Systems. See DX308, 316-319. To the extent that the analysts changed their financial estimates going forward, this re-assessment was obviously a reaction not to the mere fact that FORE fell short of $122 million in revenues, but to the *size of the miss*. See DX308 (stating that while an earnings miss was "widely expected, the magnitude of the shortfall and management's observations about slowing growth are affecting the stock . . . .") Of course, even Plaintiff has never contended that Mr. Butler had any inkling that FORE would record only $101 million in revenues for the March quarter; rather, they contended that he believed that the Company would record $120 million in revenues. There was absolutely nothing in the record indicating that analysts would have modified their estimates had FORE reported $120 million in revenues for the March quarter, as FORE management had expected.

[26]    Despite the fact that the Company routinely failed to meet or exceed its internal revenue goals, FORE always met or exceeded consensus analyst earnings expectations for every quarter prior to March 1997. Thus, missing the internal goal did not mean that the Company was likely to miss Wall Street expectations. It was, as the term indicates, an *internal* metric that was intended to motivate sales personnel, and was never used to guide or shape investor expectations.

21

Thus, the Commission's allegations and arguments relating to Butler's purported knowledge that FORE would fall short of internal goals for the March 1997 quarter were lacking in substantial justification.[27]

## III.     AN UPWARD DEPARTURE FROM THE EAJA RATE CAP IS JUSTIFIED

Plaintiff argues that no adjustment to the $125 EAJA rate cap limit is justified. This argument is meritless.

### A.     The EAJA Rate Cap Must Be Adjusted for Inflation

The Commission has failed entirely to address the cost of living adjustment provision of the EAJA, and Defendant's application thereof. Instead, the Commission has simply argued that "Butler has not shown the existence of a special factor to justify fees higher than the statutory maximum of $125 per hour." SEC Opp. at 21. This blanket assertion plainly fails to account for 28 U.S.C. § 2412(d)(2)(A), and is obviously inconsistent with all case law addressing this provision.[28]

---

[27]     It is worth noting that the Commission continues in its Opposition brief to blur the lines between FORE's internal goals and other metrics. Indeed, the Commission continues to cast Mr. Gill's "best guess" of $120 million for the March 1997 quarter as a "revised goal". SEC Opp. at 17 (referencing the "reduced revenue goal of $120 million"). Of course, this was not a revised or reduced "goal" but rather an estimate of where FORE's management actually expected the Company's revenue to end up for the March 1997 quarter. See Defendant's Corrected Memorandum of Law in Support of Amended Motion for an Award of Attorneys' Fees and Expenses at Section II.C.2.

[28]     One of the statutory exceptions to the $125/hour EAJA rate cap justifying an increased award is increased cost of living. 28 U.S.C. § 2412(d)(2)(A).  Cost of living increases are routinely granted and are normally based on the U.S. Department of Labor's Consumer Price Index ("CPI").  See Walton v. Massanari, 177 F. Supp. 2d 359, 362 (E.D. Fla. 2001).  See also Masonry Masters. Inc. v. Nelson, 105 F.3d 708, 710 (D.C. Cir. 1997) (citing Hirschey v. FERC, 777 F.2d 1,5 & n.24 (D.C. Cir. 1985)); Union of Concerned Scientists v. U.S. Nuclear Regulatory Comm'n, 840 F.2d 957, 959 (D.C. Cir. 1988); Chen v. Slattery, 842 F. Supp. 597, 600 (D.D.C. 1994) (noting that Congress intended EAJA cap to rise with the cost of living) (citing Wilkett v. I.C.C., 844 F.2d 867, 874 (D.C. Cir. 1988)).

Following the dictates of <u>Walton v. Massanari</u>, and utilizing the CPI-All Urban Consumers index, Defendant arrived at a COLA-adjusted rate cap of $156.11. Applying this adjusted rate cap to Butler's counsel's time expended in this matter would produce a capped EAJA recovery for attorneys' fees (exclusive of expenses) of $634,710.47. However, the Court should decline to apply even this adjusted cap, due to the delay and bad faith that characterized this litigation.

**B.     The EAJA Rate Cap Should Be Disregarded Due to the SEC's Bad Faith and the Undue Delay in this Litigation**

**1.     The SEC's Bad Faith Justifies an Award of Full Market Rate Fees**

Where the government has acted in bad faith, the Court may award market-rate fees under EAJA without regard to the $125 per hour fee cap. <u>See</u> <u>Action on Smoking and Health</u>, 724 F.2d at 217 & n.26 (finding of bad faith allows plaintiff to claim fees under subsection 2412(b) of EAJA, which has no fee-limiting provision); <u>Cazares v. Barber</u>, 959 F.2d 753, 754 (9th Cir. 1992) (upon finding of bad faith, court may award reasonable market-rate fees); <u>Smith v. Bowen</u>, 867 F.2d 731, 736 (2d Cir. 1989) (same). "Bad faith" includes governmental action undertaken "vexatiously, wantonly, or for oppressive reasons" in litigation. <u>Alyeska Pipeline Serv. Co. v. Wilderness Soc'y</u>. 421 U.S. 240, 258-59 (1975). Bad faith fees are awardable when the government's position was "'entirely without color' and undertaken 'for reasons of harassment or delay or other improper purpose.'" <u>Brown v. Sullivan</u>, 724 F. Supp. 76, 78 (W.D.N.Y. 1989) (citing <u>Wells v. Bowen</u>, 855 F.2d 37, 46 (2d Cir. 1988)) (other citations omitted).

The Commission argues in conclusory fashion that it did not act in bad faith. However, the Commission's behavior in this litigation went well beyond irresponsible, and crossed the line

23

into bullying and manipulative conduct. The facts as they pertain to the Commission's attempts at intimidating witnesses are well established in the record. See DX 74 at 166:13 - 169:21; DX 81 at 78:4 - 94:19; DX 85 at 247–48. See also Affidavit of Peter Barrett (filed as Exhibit 5 to the Second Enright Declaration). It is equally clear that the Commission seized upon an absurd pretext[29] to direct their analyst Paul Boeggeman to misrepresent the evidence so as to appear that Butler's trading orders on March 17, 1997 had to have immediately followed the FORE sales conference call that day.[30] Similarly, it is clear that the Commission made numerous arguments that were "entirely without color"[31] and that the Commission steadfastly avoided asking any FORE management the simple (and determinative) question of whether they knew at the time of Butler's trades that FORE was likely to fall short of expectations for that quarter.

The Court should not countenance this sort of behavior from litigants, especially the United States government. Consequently, the Court should disregard the EAJA statutory rate

---

[29]    The Commission misconstrues and distorts Butler's investigatory deposition transcript to justify its direction to Boeggeman to confine his analysis to the 6599 extension at Prudential's Washington, DC offices. SEC Opp. at 20. This argument fails, however, because the Commission knew full well, based on the full phone records, that Butler had placed numerous calls to the 6534 and 6581 extensions before, on and after March 17, 1997. This effort to distort the evidence in the face of clear documentary proof can only be termed as having been done in bad faith.

[30]    By only considering calls to one specific extension, the Commission evidently hoped to establish that Mr. Butler's call placing the order to buy puts and sell calls on March 17, 1997 could have only have taken place after the FORE sales conference call that was thereafter memorialized by Mr. Gill's March 18, 1997 email. However, the relevant phone records in this case show that Mr. Butler placed numerous calls to Prudential's Washington, DC offices both before and after this conference call on March 17, 1997. See Exhibit 4 to the Second Enright Declaration.

[31]    For example, the Commission's argument that Butler somehow profited from knowledge that FORE would fall short of its never-disclosed internal goals was beyond specious: it was laughable. See Section II.D.3, supra. Moreover, as the Court noted, the "bookings and revenue information available to FORE management at or about the time of Butler's option trading *indicated to everyone, except the Commission, that FORE was on track to meet Wall Street expectations*." Butler, 2005 U.S. Dist. LEXIS 7194 at * 22 (emphasis added). The Court similarly noted that Plaintiff's other arguments were "illogical", "speculative", "inconsistent with the facts of the case", "contrary to law" and "contrary to the clear weight of the evidence". Butler, 2005 U.S. Dist. LEXIS 7194, * 24, 37, 40, 42.

cap, and award Butler his full attorneys' fees. <u>Action on Smoking and Health</u>, 724 F.2d at 217 &

n.26; <u>Cazares</u>, 959 F.2d at 754.

### 2. Undue Delay Justifies an Award of Full Market Rate Fees, Even Where the Delay Was Not the Fault of the Plaintiff

Courts have also specifically recognized litigation delay as a "special factor" warranting a

fee increase.[32] Here, it is beyond question that this litigation was exceptionally long-lived, the

judgment having become final nearly five years after the litigation was initiated, and over eight

years after the trades in question took place. Moreover, the Commission has not disputed the fact

that this action was unduly delayed, nor has the Commission contended that this delay was due to

any fault on the part of Defendant.

Nevertheless, the Commission argues that Butler has not established that this delay was

the Commission's fault. This argument is irrelevant, because "delay may be regarded as a

'special factor' under the EAJA without differentiating among possible causes of delay."

<u>Oklahoma Aerotronics</u>, 943 F.2d at 1350, <u>quoting Wilkett</u>, 844 F.2d at 876. Stated another way,

whether or not the delay was the fault of the Commission is not the issue: the issue is whether the

delay was severe enough to justify an upward departure from the EAJA cap, even if the delay

was caused by the Court and not the parties. As such, given the five year duration of this

---

[32]     See <u>Wilkett v. Interstate Commerce Comm'n</u>, 844 F.2d 867, 876 (D.C. Cir. 1988) (EAJA allows court to award fees in excess of statutory cap for delay where delay is exceptional and is not the fault of the prevailing party); <u>Action on Smoking and Health</u>, 724 F.2d at 119 (allowing upward adjustment under EAJA where court found that a year's delay in the litigation was directly attributable to agency action); <u>Wonders v. Shalala</u>, 822 F. Supp. 1345, 1347 (3d Cir. 1992) (noting that one of EAJA's purposes is to provide a disincentive to agencies to prolong the litigation process, and that awarding higher, fully compensatory fees better serve this purpose); <u>Oklahoma Aerotronics, Inc. v. United States</u>, 943 F.2d 1344 (D.C. Cir. 1991) (allowing enhancement for delay where delay was occasioned by the judiciary); <u>Perales v. Casillas</u>, 950 F.2d 1066, 1077 (5th Cir. 1992) (exceptional circumstances of delay not attributable to plaintiffs may constitute "special factor" permitting increase in statutory cap).

litigation, the Court should disregard the EAJA rate cap and award Butler his full attorneys' fees.

See, e.g., Wilkett, 844 F.2d at 876 (adjusting attorneys' fees due to four year delay).

## IV.    BUTLER'S ATTORNEYS' FEES AND EXPENSES ARE FAIR AND REASONABLE

### A.    Butler's Attorneys' Fees Were Far From Excessive

This litigation lasted almost five years.  It involved literally dozens of depositions.  The parties presented hundreds of documentary exhibits at trial, which were themselves culled from a much larger universe of documents.  The parties briefed cross motions for summary judgment, two consecutive cross motions to strike each others' expert witnesses' reports and testimony, and numerous evidentiary motions.  Finally, the parties provided the Court with a pre-trial narrative and a pre-trial brief, in addition to numerous stipulations of fact, prepared for trial, and then presented evidence at trial for four days.

In light of the above, the most remarkable thing about Defendant's attorneys' fees is how small they are.  4,133.1 hours of time is hardly excessive given the duration and complexity of this litigation.  Moreover, this time was contemporaneously recorded in exacting detail.  There is no question that this time was actually spent on this matter.

The Commission's sole substantive argument on this point is that Defendant's counsel sent two attorneys to most of the depositions in this case – depositions that were crucial to Butler's defense because many of the witnesses were likely to be unavailable for trial.  The notion that sending two attorneys to such depositions is somehow excessive is absurd, particularly given that: a) the Commission itself sent two attorneys (Michael Novakovic and Catherine Pappas) to certain depositions (see, e.g., DX86); and b) the Commission had at least

four attorneys assigned to this matter for most of its duration (Novakovic, Pappas, Kingdon Kase and Eustace Francis), and three attorneys (Kase, Pappas, Francis) present for the entire trial. Plainly, this argument fails.[33]

Furthermore, this was a complex matter requiring significant analysis of the financial markets and other statistical and mathematical issues. For this reason, Butler's counsel's in-house Certified Financial Analyst, Robert Garcia, spent significant time analyzing and developing the factual record in this matter. Mr. Garcia was noticed as a trial witness, and would have testified had Butler been required to present his defense. His role in the case was little different from that of Paul Boeggeman (except, of course, Defendant's counsel did not instruct Mr. Garcia to grossly misrepresent the evidence). Of course, the Commission retained and used an expert (Craig McCann) in addition to Mr. Boeggeman. See Third Butler Affidavit at 37.

Finally, Defendant notes that the Commission has failed to cite any authority for its assertion that his counsel spent excessive time on this matter, and has tellingly failed to aver the amount of time it spent on this matter itself. As such, there is no basis for the Court to conclude that Defendants' requested attorneys' fees are excessive.

**B.    Butler's Proper Litigation Expenses Were $216,824.39**

The Commission, ignoring the adage that this Court "should award expenses unless an exception identified by [EAJA] applies," wrongly argues Defendant should be wholly precluded from recovering expenses for expert services. Hiciano v. Apfel, Civ. No. 97-4027, 2002 U.S.

---

[33]    See Pohl Corp. v. United States, 29 Fed. Cl. 66, 74 (Fed. Cl. 1993) ("[The government] also contends that only one attorney was necessary for depositions and possibly two for major hearings and trial. Thus, [the government] maintains, the public fisc should not have to pay for both [attorneys'] attendance at depositions, hearings and at trial. However, the court notes that [the government] had two attorneys working on the entire case, and had three attorneys present at counsel's table during trial. In light of this fact, defendant's contention rings hollow.")

Dist. LEXIS 9349 *14 (S.D.N.Y. 2002). The Commission is wrong. Indeed, the Commission fails entirely to present *any* exception which would justify such a denial. The Commission's argument, made with no support, is that Court's partial grant of a Motion to Strike a single expert report warrants a complete denial of all of Defendant's expert expenses.[34]

The Commission improperly narrows the scope of expenses recoverable under EAJA. It is well-settled that the key question in determining whether a particular expense is recoverable under EAJA is whether that expense was "of a type which [is] normally billed to a client." SEC v. Kaufman, 835 F.Supp. 157, 159 (S.D.N.Y. 1993). Defendant's expert report fees are manifestly of a type normally billed to a client and were in fact billed to Defendant. Those costs, as such, are plainly recoverable under EAJA.

The fact that this court ultimately partially struck that report is of no consequence whatsoever. The telling absence of case law in the Commission's brief should make this clear. Indeed, courts have noted the propriety of awarding a petitioner expenses incurred for expert witnesses who were retained but who never testified at trial when – as here – those expenses were of a type normally passed on to a client. Brunswick v. United States, 661 F.Supp. 1431, 1445 (S.D. Ga. 1987), reversed on other grounds 849 F.2d 501 (11th Cir. 1998). This Court should accordingly reject the Commission's argument and award Butler the full cost of the expenses he incurred in connection with the experts he retained.

Simply put, Defendant incurred clearly legitimate expenses when he paid for the preparation of the report the Commissions attacks and Defendant is entitled to recover those

---

[34]    The Commission fails to mention they submitted a similar expert report that suffered a similar fate at the hands of this Court. Plainly, both the Commission and Defendant were of the impression that the subjects covered in those reports were appropriate subjects for expert testimony.

28

costs.  Such an award would "resonate[] with the purposes of EAJA in allowing prevailing

parties in actions against the Government to be *fully* compensated for the costs of asserting their

rights in cases where the Government's position is not substantially justified."   Id.  Moreover,

given that Defendant relied on expert services throughout the proceedings against him, both logic

and law weigh against Plaintiff's argument that Defendant should be preluded from *any* recovery

for those services as a result of the order striking the initial report.  See Pohl Corp. v. United

States, 29 Fed. Cl. 66, 75 (Fed. Cl. 1993) ("[D]efendant has challenged the fees paid to Mr. Jack

Yampolsky, an expert witness, since his testimony was excluded at trial. However, Mr.

Yampolsky . . . assisted in the preparation of a chart that was admitted at trial . . . . The court will

allow the expenses for Mr. Yampolsky.").  *At the very least*, Defendant should be permitted to

recover his expert expenses unrelated to the stricken report.

The Commission's propensity to improperly narrow the scope of EAJA continues with

their argument that Defendant should be precluded from recovering any costs whatsoever related

to photocopying or handling of documents.  As the Commission notes, Defendant is barred from

recovering "any of the costs enumerated in 28 U.S.C. § 1920."  The *only* photocopies falling

within the scope of 28 U.S.C. § 1920 are photocopies made for either the Court or for opposing

counsel.  Tavarez v. Heckler, 610 F. Supp. 1059, 1064 (S.D.N.Y. 1985) (noting "photocopying

expenses [fall within the scope of] § 1920 only to the extent that the copies were furnished to the

Court or to opposing counsel.").  All other copying costs are recoverable under EAJA.  Hicano,

2002 U.S. Dist. LEXIS 9349 * 14. (noting "copies made for the convenience of counsel or the

court are not taxable," and, therefore, are not barred by 15 U.S.C. § 77aa).  Nevertheless, the

Commission seeks to bar *all* of Defendant's copying costs and document fees.  This is improper,

and the Commission's attempt to prevent Defendant from fully recovering his expenses should be denied as inconsistent with both the letter and spirit of EAJA.

## CONCLUSION

For the foregoing reasons, the Court should enter an Order directing the United States Securities and Exchange Commission to pay David Butler $1,103,616 as recompense for the full market rate of Butler's attorneys' fees under the EAJA (and the "bad faith" and "undue delay" exceptions to the EAJA rate cap provisions). Alternatively, if the Court determines not to disregard the EAJA rate cap, the Court should apply a COLA- adjusted cap of $156.11, and award Butler $634,710.47 to partially reimburse him for his attorneys' fees. Furthermore, the Court should enter an Order awarding Butler $216,824.39 for his costs and expenses of this litigation under the EAJA and/or 28 U.S.C. § 2412(a)(1).

Dated: September 21, 2005

Respectfully submitted,

Douglas G. Thompson
Donald J. Enright
FINKELSTEIN, THOMPSON
    & LOUGHRAN
1050 30th Street, N.W.
Washington, DC 20007
(202) 337-8000

Attorneys for David W. Butler

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. 00-1827 |
| Plaintiff, | Judge Cercone |
| v. | |
| DAVID W. BUTLER, | |
| Defendant. | |

## CERTIFICATE OF SERVICE

I, Thomasine L. Butler, hereby affirm and attest under penalty of perjury that a copy of

Defendant David W. Butler's Reply Memorandum in Support of Amended Motion for an Award

of Attorneys' Fees and Expenses and the Third Declaration of Donald J. Enright was served by

United States Mail upon:

Catherine Pappas, Esq.
United States Securities and Exchange Commission
Mellon Independence Center
701 Market Street, Suite 2000
Philadelphia, PA 19106

Timothy N. McGarey
Office of General Counsel
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

Sworn and subscribed this 21st day of September, 2005.

Thomasine L. Butler