# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

       Plaintiff,

   v.

DAVID W. BUTLER,

       Defendant.

Civil Action No. 00-1827

Judge Cercone

## DEFENDANT'S MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR TO STRIKE

Respectfully submitted by:

Douglas G. Thompson, Esq.
Donald J. Enright, Esq.
FINKELSTEIN, THOMPSON & LOUGHRAN
1050 30th Street, NW
Washington, DC 20007
(202) 337-8000

Attorneys for Defendant

## INTRODUCTION

Inventing argument out of whole cloth, the United States Securities and Exchange Commission (the "Commission" or "Plaintiff") moves to strike the Supplemental Declaration of Donald J. Enright in Support of Defendant's Motion for Fees and Expenses (the "Supplemental Declaration" and "Defendant's EAJA Motion") by half-heartedly positing the specious argument that the Court lacks jurisdiction to consider such materials. In reality, Plaintiff is merely seeking an additional opportunity to further burden the Court (and Defendant) with ever greater volumes of sophistic argumentation.

Knowing that its position in this litigation was far from substantially justified, the Commission has been forced to make increasingly absurd arguments attacking the net worth calculations Defendant has provided to the Court. In reality, the Supplemental Declaration and Defendant's prior submissions have presented information and analysis sufficient to allow the Court to find conclusively that Defendant's personal net worth as of September 14, 2000 was well under the $2 million threshold, and was actually less than $1 million. As such, it is clear that the Commission's Motion to Strike is meritless, and that the Court should give due consideration to the Supplemental Declaration in granting Defendant's EAJA Motion.

## ARGUMENT

### I.   AN EAJA APPLICATION PERMITS INFORMALITY OF PROOF AND SHOULD BE CONSTRUED CONSISTENT WITH THE STATUTE'S INTENTIONS

The Commission argues unconvincingly that the Court should adopt an unreasonably narrow view of the evidence before it and refuse to consider materials that are clearly relevant upon Defendant's EAJA Motion. This argument runs contrary to the nature and purpose of the

1

EAJA, and is contravened by precedent. As such, it is clear that the Commission is desperate to prevent the Court from considering a full and fair record of the facts at issue.

The Courts have been clear that informality of proof and policy considerations favoring EAJA petitioners should be the hallmark of the government's inquiry into the $2 million net worth question. Broaddus v. United States Army Corps Of Engineers, 380 F.3d 162, 171-72 (4th Cir. 2004) (holding that "the 'cost of acquisition' calculus was included by Congress to aid applicants, not hinder them from pursuing attorney's fees under EAJA" and "EAJA's purpose was to empower individuals and small businesses in litigation against the government"); United States v. 88.88 Acres of Land, 907 F.2d 106, 108 (9th Cir. 1990) (quoting Hensley v. Eckerhart, 461 U.S. 424 (1983) (holding that "a 'request for attorney's fees should not result in a second major litigation.' Consequently, some informality of proof is appropriate.")); Cont'l Web Press v. NLRB, 767 F.2d 321, 323 (7th Cir. 1985) ("The proceeding to recover fees under the [Equal Access to Justice] Act is intended to be summary; it is not intended to duplicate in complexity a public utility commission's rate of return proceeding.").

It is important to note that reconstructing an individual's net worth as of five years ago is a challenging and time consuming effort, requiring the petitioner to obtain and utilize numerous documents (some of which date back to the early 1990s) that, due to the long passage of time, have often been misplaced. Obtaining the necessary documents has required enormous effort on the part of Defendant, and has taken substantial time.

The challenges Defendant has faced in reconstructing the documentary basis for an accurate net worth calculation have been presented largely due to the lengthy passage of time since this action was initiated. The policy considerations underpinning the EAJA counsel against

penalizing the wrongly accused party for lengthy delays in litigation: rather, every source of authority indicates that the Court should show patience in allowing the Defendant ample opportunity to demonstrate his satisfaction of the net worth requirement. See, e.g., Wonders v. Shalala, 822 F. Supp. 1345, 1347 (3d Cir. 1992) (noting that one of EAJA's purposes is to provide a disincentive to agencies to prolong the litigation process).

Moreover, nothing in the Joint Stipulation, nor in the Court's rules, prohibits an EAJA petitioner from providing the Court with newly obtained evidence. To the contrary, all of the equities (and the purposes of the EAJA itself) counsel that the Court should consider as much information as possible in order to best arrive at a just and fair decision.[1] As such, the Court should consider all of the submissions before it, and rule accordingly.

## II.    NUMEROUS COURTS HAVE CONSIDERED ADDITIONAL EVIDENCE OF EAJA MOVANTS' NET WORTH SUBMITTED AFTER THE FILING OF A TIMELY MOTION

While the Commission argues (without the benefit of any supporting authority) that the Court lacks jurisdiction to consider financial information submitted after the initial petition for the purposes of calculating Defendant's net worth, it actually acknowledges that numerous Courts have, in fact, considered amended and revised net worth calculations after the initial filing of an EAJA petition. See SEC Memo of Law in Support of Motion to Strike at 2 (noting "case law which generally accords an applicant the opportunity promptly to correct a failure to document the applicant's net worth") . See, e.g., Bazalo v. West, 150 F.3d 1380, 1383 (Fed. Cir.

---

[1]     As a general policy consideration, courts generally seek to make sound, just decisions on the merits rather than upon picayune pleading issues. The policy consideration underpins, for example, the "liberal leave" standard of Fed.R.Civ.Pro. 15(a). Similarly, given the purposes of the EAJA, it is clear that the courts should and do provide petitioners with significant leeway in allowing them to satisfy the net worth requirements of the EAJA.

3

1998) (holding that an EAJA petitioner may supplement his application with regard to the $2

million threshold after filing a timely motion). Thus, unless these Courts were acting beyond the

scope of their jurisdiction, these decisions acknowledged by the Commission fatally undermine

this jurisdictional argument.

Only if the ***motion itself*** is late does the Court lack jurisdiction to consider it. Indeed,

once an EAJA motion is timely filed, the Court has full jurisdiction to consider it, and all

supporting materials. <u>Id.</u> As such, it is clear that the Commission's jurisdictional argument

utterly fails.

### III.    THE SUPPLEMENTAL DECLARATION IS CONSISTENT WITH THE PRIOR SUBMISSIONS AND SERVES TO PROVIDE THE COURT WITH IMPORTANT, NEWLY AVAILABLE INFORMATION

#### A.    The Third Olson Affidavit is Consistent With the Prior Submissions

The Commission argues that Olson's three affidavits (including the Third Olson

Affidavit, filed with the Supplemental Declaration) "employed different methodologies" and

"significantly revises" his position in this petition.   This is simply false.

In fact, Olson's three Affidavits have been entirely consistent with one another, and the

Second and Third Affidavits merely clarified and augmented the original (based upon the

uncovering of additional documentary evidence) while applying a consistent and rigorous

analysis.

Contrary to the Commission's specious attacks, the continuing refinement of Olson's

analysis is not indicative of any unreliability, but rather of a careful, conservative approach which

makes the best possible sense given the evolving availability of documents evidencing Butler's

net worth at the outset of this litigation. Utilizing the un-depreciated acquisition value of

Butler's automobiles and the full, appreciated value of Butler's investment accounts, Olson was initially able to calculate that Butler's net worth on the relevant date "was no more than $1,952,845.33 and was probably less." Thereafter, further documents concerning the depreciated value[2] of Butler's automobiles[3] and the exact balance of the Wells Fargo account were uncovered. These new documents allowed Olson to set aside the previously overly-conservative assumptions he had employed, and allowed him to opine that Butler's net worth had been "no more than $1,913,154.98, and . . . probably less."

Thereafter, Butler obtained further documentation relating to his IRA retirement accounts, which allowed Olson to replace the prior conservative "marked to market" valuation of those assets with a more appropriate "cost of acquisition" value, consistent with the prevailing caselaw on this point. See, e.g., Broaddus, 380 F.3d at 173 & n.10 (holding that "to determine the EAJA value of an asset, as is consistent with GAAP, its acquisition cost must be reduced by any accumulated depreciation of that asset"); Cont'l Web Press, Inc., 767 F.2d at 322-23 (same). Thus, Olson was finally able to opine that Butler's net worth as of September 14, 2000 was actually no higher than $1,856,125.81.

---

[2]        The Commission argues that, as an individual (as opposed to a business entity), Butler is not entitled to depreciate the acquisition cost of his automobiles for the purposes of calculating the value of his assets. This argument is squarely rebutted by the Broaddus decision, which specifically held that the acquisition cost of an individual's assets should be depreciated for the purposes of calculating his net worth. See Broaddus, 380 F.3d at 173-74 (using depreciation principles to conclude that Henry Ruffin Broaddus' net worth at the time of the initiation of that litigation must have been below $2 million).

[3]        The Commission argues that if the acquisition cost of Butler's automobiles is to be depreciated for the purpose of calculating his net worth, then the purportedly appreciated value of his home should be used. However, it is quite clear that the unappreciated cost of acquisition would be the proper value to use for this asset in calculating Butler's net worth under EAJA. See Broaddus, 380 F.3d at 172 n. 9 (holding that "the cost of acquisition helps the court fulfill EAJA's purpose where the applicant . . . is land rich but cash poor.")

Where hard documentation was not available, Olson assumed such facts as would *maximize* the resulting net worth figure – that is, he assumed the worst case for Butler and the best for the Commission. Thus, as further documentary evidence became available, Olson was able to replace the extremely conservative assumptions with documented facts, thereby reducing the calculated net worth. Moreover, Olson's first and second affidavits *explicitly* noted that further documentation could and likely would allow him to further refine his analysis and reduce the calculated net worth accordingly.[4] As such, the successive adjustments to Olson's calculations do not represent a self-reversal or other inconsistency indicative of a lack of credibility, but rather are the careful work of a CPA basing his opinions precisely on the documentation as it has become available to him.

### B.    The Third Olson Affidavit, Combined With the Prior Submissions, Conclusively Establishes That Butler's Net Worth Was Less Than the $2 Million Threshold

While each Olson affidavit has been based upon solid documentary evidence and conservative assumptions (thereby allowing Olson to opine on the maximum that the net worth could have been), each successive calculation has been based on more and better documentary evidence. Thus, rather than undermine Olson's credibility, as the Commission would have the Court believe, these refinements and the additional documentary evidence make Olson's opinions *increasingly* accurate and reliable. Olson's third calculation, revealing that Butler's net worth (combined with that of his wife) was no more than $1,856,125.81, was well documented

---

[4]    See First Olson Affidavit at ¶ 8 - 10 (stating that the net worth calculation was subject to revision as additional documentation of liabilities and costs of acquisition became available, which would reduce the net worth figure significantly); Second Olson Affidavit at ¶ 8 (stating that Butler's retirement account valuations were subject to further reduction as documentation of the costs of acquisition became available).

and clearly establishes that Butler's individual net worth as of September 14, 2000 could not have exceeded the statutory threshold. As such, it is clear that Butler has satisfied the requirements of 5 U.S.C. § 504(b)(1)(B)(i).

### 1. Depreciated Cost of Acquisition is the Proper Measure of an Asset's Value for the Purposes of an EAJA Petition

The Commission argues that Butler has failed to cite any authority for the proposition that depreciated cost of acquisition is the proper measure of an asset's value for the purposes of an EAJA net worth calculation, and further argues that it should be market value on the date in question that governs the net worth calculation. This argument is squarely rebutted by the Broaddus decision, which specifically held that the acquisition cost of an individual's assets should be depreciated for the purposes of calculating his net worth. See Broaddus, 380 F.3d at 173-74 (using depreciation principles and concluding movant's net worth at the time of the initiation of that litigation must have been below $2 million). See also 88.88 Acres of Land, 907 F.2d at 107 (determining "cost of acquisition" based on what individual originally paid for his land); Am. Pac. Concrete Pipe Co. v. NLRB, 788 F.2d 586, 590 (9th Cir. 1986) (considering as "cost of acquisition" the original cost of a company's assets minus depreciation); Cont'l Web Press, 767 F.2d at 323 (deriving net worth figure from a company's books then subtracting depreciation).

Indeed, Broaddus specifically addressed the same argument the Commission raises here, and held that the cost of acquisition standard specifically applies to "marketable securities". Broaddus, 380 F.3d at 173, n. 10. As such, it is clear that the acquisition cost of assets is the

7

proper measure of that asset's value for an EAJA net worth calculation, and that where that asset has declined in value since being acquired, the depreciated value should be used.

### 2. All of Kristin Butler's Assets Were Included in Every Calculation Presented to the Court

The Commission argues that Kristin Butler's assets have not been disclosed in connection with this EAJA petition, and that neither the Commission nor the Court can therefore calculate Butler's marital or individual net worth. This is simply false: every asset owned by Kristin Butler has been disclosed and accounted for in Steven Olson's net worth calculations as reflected in his affidavits filed with the Court. See Affidavit of Kristin Butler, filed herewith as Attachment 1. As such, the Commission's argument in this regard is meritless.

### 3. Butler's Individual Net Worth Is Half of the Combined Marital Net Worth

The net worth calculus attendant to an EAJA petition is intended to limit this remedy to litigants with limited means to maintain an adverse position to that of the United States government in litigation. See Broaddus, 380 F.3d at 171. Thus, the EAJA net worth should be reflective of the resources upon which a litigant could draw in pursuing litigation. Here, Butler's marital net worth totaled $1,856,125.81, but his individual net worth should be approximately half that, because he could not have drawn upon his wife's half of the marital assets for the purposes of this litigation.

The Commission acknowledges that "a spouse must consent to disposition" of assets comprising marital community property. See SEC Memorandum of Law in Support of Motion to Strike at 10. This is consistent with the California Family Code, which states "nor may one spouse sell (even for adequate consideration) or encumber personal property . . . without the

8

written consent of the other. Cal. Fam. Code §1100(c). Similarly, both spouses must join in any instrument purporting to convey or encumber community real property. Cal. Fam. Code §1102.

In fact, Kristin Butler did not and never would have consented to Butler's use of what she regarded as her half of the marital assets for the purposes of this litigation. See Attachment 1. Indeed, Mr. And Mrs. Butler executed and registered a "Transmutation Agreement" reflecting exactly this reality in 2002. See id. See also Affidavit of David W. Butler dated October 28, 2005, filed herewith as Attachment 2. As such, Mr. Butler's assets which he could draw upon in pursuing this litigation – his EAJA net worth – was no more than half of the marital net worth. Of course, half of $1,856,125.81 is $928,602.91 – and figure far, far below the $2 million statutory threshold.

## C.    The Commission Has Already Received Full Discovery of The Source Materials

Defendant produced several boxes of documents to the Commission during the discovery phase of this matter, including essentially all of Butler's then-possessed financial records. Between that document production and the materials that have been filed with the Court with the Olson affidavits, the Commission has already received all available documentation relating to the issue of Butler's net worth as of September 14, 2000. As such, further discovery would be fruitless and a waste of judicial resources. See generally Drozdowski v. Signature Flight Support Corp., Case No. 04-3624, 2005 U.S. Dist. LEXIS 1515 *12 (E.D. Pa. 2005) (noting waste of resources inherent in duplicative discovery).

9

## CONCLUSION

For the foregoing reasons, the Commission's Motion to Strike should be denied in its entirety. Moreover, since the Commission has already (by this Motion) been heard to respond to the contents of the Supplemental Declaration, no further leave to respond should be granted.

Dated: October 28, 2005

Respectfully submitted,

Douglas G. Thompson
Donald J. Enright
FINKELSTEIN, THOMPSON
& LOUGHRAN
1050 30th Street, N.W.
Washington, DC 20007
(202) 337-8000

Attorneys for David W. Butler

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 00-1827 |
| v. | ) | |
| | ) | |
| DAVID W. BUTLER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

| | | |
|---|---|---|
| STATE OF CALIFORNIA | ) | |
| | ) | ss: |
| COUNTY OF SAN MATEO | ) | |

## AFFIDAVIT OF KRISTIN G. BUTLER

I, Kristin G. Butler, being duly sworn, do hereby testify as follows:

1.    I am an adult of majority age, of sound mental health, and I make this affidavit based on personal knowledge. If called to do so, I could and would testify truthfully about the matters set forth herein as follows.

2.    David W. Butler, the plaintiff in this matter is my husband. We were married in 1984 and have two sons.

3.    I actively participated in David's search for documents to enable Steve Olson to validate our combined net worth as of September 14, 2000. We engaged in the effort for several months.

4.    As a result of this search, David and I have provided Steve Olson with all documentation we can obtain which could be relevant to his analysis.

"ATTACHMENT 1"

5.    I have not knowingly withheld any data relating to any assets in my name, including life insurance policies, annuities, or any real property. I did not hold title to, or hold any other claim in, any foreign interests as of September 14, 2000.

6.    I spoke to Steve Olson several times during the process of gathering data and had told him that I also have provided all appropriate data to him.

7.    To the extent that David's net worth for this matter is intended to measure the resources a party may draw upon in litigating against the United States government, David could not have drawn upon my half of the marital assets for such purpose, as I would not have allowed it.

8.    In 2002 David and I signed a transmutation agreement, opting out of the California common law system. This effectively eliminated David's ability to spend assets that were legally, morally, and rightfully mine. I did not enter into the transmutation agreement in anticipation of David's EAJA trial, but rather, in part, to enable me to enforce my rights without resorting to divorce. At that time, David was determined to fight the SEC at any cost, based solely upon the principle that he was innocent. I did not share his fight-at-all-cost attitude, and opted instead to protect my ability to raise, care for and educate our children.

9.    Regardless of the value of David's and my combined net worth, I would never have consented to the use of more than half of our assets for the pursuit of this trial. I believe my insistence on, and execution of, our transmutation agreement eliminates any doubt of my resolve.

10.    David has spent his remaining assets defending himself, and has entered into substantial debt to FTL and others to support his successful effort.

11.    Had it been up to me, I would have chosen to settle with the SEC in 2000, and moved back to Europe to avoid the stigma and devastation this case has brought upon our family, as well as the intimidation the SEC has brought to our friends and colleagues. During the investigation, David maintained that the SEC was not likely to file suit as there was no way to

construct a case that even "passed the smell test" as he put it. During the next five years David maintained his innocence, as our isolation and humiliation increased and our resources dwindled. I am grateful for the opportunity to have attended the trial, to see for myself that David's statements regarding the SEC were true. Their allegations, and their behavior, made absolutely no sense to me.

12.    I am appalled at what our Government has done to our family, and to my husband. I cannot understand why this happened in the first place.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct, executed this $\underline{28}$ day of October, 2005.

Kristin G. Butler

10-28-05

ENRIQUE L. BRIME
Comm. # 1372374
NOTARY PUBLIC - CALIFORNIA
San Mateo County
My Comm. Expires Aug. 28, 2006.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SECURITIES AND EXCHANGE COMMISSION,    )
                                                )
                         Plaintiff,    )
                                                )      Civil Action No. 00-1827
                     v.                         )
                                                  )
DAVID W. BUTLER,                        )
                                                  )
                         Defendant.    )
                                                  )

STATE OF CALIFORNIA               )
                                          )    ss:
COUNTY OF SAN MATEO           )

## AFFIDAVIT OF DAVID W. BUTLER

I, David W. Butler, being duly sworn, do hereby testify as follows:

1.      I am an adult of majority age, of sound mental health, and I make this affidavit based on personal knowledge. If called to do so, I could and would testify truthfully about the matters set forth herein as follows.

## SEC ALLEGATIONS

2.      The SEC states that I have not provided a copy of a retainer agreement with Finklestein, Thompson & Loughran, as though this fact is relevant in some way. The agreement I entered into with Burton Finkelstein to pay my counsel $100,000 upon notification that the Commission had determined to file suit against me was never reduced to writing. I cannot provide a written agreement that never existed. I have not withheld it as the SEC implies, and both I and Burton Finkelstein have submitted sworn affidavits addressing the timing and nature of this $100,000 obligation.

"ATTACHMENT 2"

3.     The SEC noted that $100,000 was transferred to FTL on September 15, 2000. They fail to mention that these funds were transferred into the Wells Fargo account expressly for the purpose of paying my counsel before that time. This provides objective evidence that this obligation existed and was in place prior to September 14, 2000.

4.     I was unable to find adequate acquisition price documentation for the cars I owned on September 14, 2000, so my accountant, Steven Olson, used the acquisition price based upon my recollections.   I was later able to determine blue book prices for my cars, which represented the only concrete data that was available at the time. As I had purchased my Acura after a lease for its residual value, I believe the blue book value used by Olson was actually higher than the acquisition price.


DATA COLLECTION AND TIMING

5.     I have only been employed by IBM (1984-1988), Network Systems (1998-1992), FORE Systems and its subsidiaries (1992-1998), Mirapoint (1999), and Fast Forward Networks (2000) before September 14, 2000.

6.     The SEC claims that I had ample time to prepare financial records and documents to enable Mr. Olson to analyze my net worth. The truth is quite the contrary. In my initial production of data to Mr. Olson, I provided all material I had which showed the status of every asset and liability for myself and for my wife as of September 14, 2000.  After his initial analysis, Olson informed me that financial statements for EAJA were calculated using a cost basis methodology. He stated that if I could not find sufficient evidence of the cost basis for my retirement accounts, he would use the more conservative present value of the accounts until such supporting documentation could be found.  Finding the cost basis of the accounts required locating all historical W-2s issued to me, and appropriate documentation from account records.

7.     I subsequently provided Mr. Olson with sufficient documentation to enable Olson to opine on the cost basis of the FORE Systems based Fidelity/Marconi retirement account. However the data I provided regarding my Prudential retirement account was inadequate for Olson to make a determination of the cost basis of the Prudential retirement account.  Olson noted this in his first affidavit.

8.    Still later, after Mr. Olson's first affidavit had been prepared and filed with the Court, I provided Mr. Olson with Blue Book data for the cars, and most of my W-2s, though a few remained missing.  Olson further stated that because my employment at both Network Systems and IBM could have contributed to the Prudential IRA, I needed to provide him sufficient data to determine total contributions to all historical IRA/401(k) plans, at all places of employment.  I returned again with and as much as I was able to obtain, and Olson submitted his second affidavit reflecting the new materials.

9.    Thereafter, I continued my search to find sufficient data to enable Olson to determine the appropriate cost basis of my retirement accounts.  This required me to complete my search for missing W-2s and other data all the way back to 1984, for both myself, and for my wife.  In addition to searching old files, I contacted old tax accountants, former employers, and banks.

10.    During this search I obtained a statement from Marconi reflecting a higher value of contributions to my FORE Systems retirement account stated in 2002.  While these increased contributions could have been made after the filing of this lawsuit, Olson revised his reflection of this account upward.  From my perspective, this does not reflect a "results-oriented" methodology of the sort the SEC ascribes to Olson.

11.    Eventually I was able to establish, through complete W-2 production and a sufficient number of statements, that I had no IRA/401(k) contributions during my employment at IBM, and show the exact contribution amount during my employment at Network Systems.

12.    It was my clear understanding that as I had shown all my contributions to all retirement funds from all sources of employment, the cost basis of all retirement accounts in total could be ascertained by simply adding all these contributions together.  While it was clear that I had established the entire superset of contributions to all retirement accounts, Olson stated to me that he still desired to track the IRA and 401(k) accounts from inception to their status as of September 14, 2000 before he felt comfortable with an affidavit regarding a cost basis of the Prudential account.

13.    Through substantial effort, we tracked the Network Systems retirement account to closure and rollover to IBM, with subsequent rollover to Fidelity, and subsequent transfer of the Fidelity accounts to Prudential.  This was extraordinarily difficult as this process occurred over two decades, and I did not recall how and when each of these rollovers occurred with any

meaningful detail. I did recall that the underlying basis of the prudential IRA was from my employment with Network Systems and the underlying basis of the Fidelity/Marconi·IRA was my employment with FORE Systems.

14.    The SEC has objected to missing data representing "gaps" in the status of the account at Prudential Securities. They also suggested that I should have provided a Fidelity statement to Olson to clarify the transfer of the account into a Prudential custodianship. When the Fidelity IRA was transferred to Prudential, the account was transferred to an account manager acting on my behalf. As such, I believe that Fidelity statements were sent directly to Prudential during that time and not to me. In short, this documentation simply does not exist, and likely has never been in my possession.

15.    I had provided Olson with every Fidelity statement I could find. I contacted Prudential Securities and requested their assistance in locating missing Prudential Statements and missing Fidelity statements. They declined to assist me. In my discussions with them it became clear to me that all the data regarding all of my Prudential accounts during the majority of times relevant to this question, had already been subpoenaed by SEC in 1998. Further, an initial search of the over 30,000 pages of data they provided in discovery showed some number of Fidelity statements that I believe originated from the time Prudential was administering the Fidelity IRA account. Further, these documents were poorly, if at all, organized, when provided to me. The few Fidelity statements I found were isolated and not apparently organized by subpoena or subject (one of the few organized sets of documents I received in discovery was a neatly stacked replication of every email I had received or sent which contained an off-color or juvenile joke over a several year period.)

16.    It should be noted that I also struggled in finding a few W-2s from the mid 1990s. It turned out that many documents were missing as I had collected them for subpoena submission to the SEC, and subsequently failed to re-file them nearly a decade ago. I believe that the fact and existence of this very case greatly hampered my ability to locate documents. Many of the documents I eventually provided to Mr. Olson came, in fact, from the documents produced to me by the SEC.

17.    The SEC's allegation that I had ample time to recover 20 years of records, that I did not know I would require, is astounding to me. Rather than being "inexcusable" as they

claim, it was unavoidable. I was producing historical documents for Olson nearly on a daily basis.

18.    The SEC speculates if I have produced everything, or if I could continue to produce additional data. I have produced everything I have to Mr. Olson regarding both myself and my wife. Yet several account statements associated with my financial affairs over the past 20 years remain missing. If the missing documents were found, I do not believe they could add any clarity to the calculations of the cost basis of my retirement accounts. All such data has been found and produced. However, they could show additional detail regarding the rollovers of my Prudential IRA from Networks Systems to IBM, to Fidelity to Prudential, and what happened to it inside of Prudential. I believe that the SEC has already subpoenaed much of this data that it seeks, and has possessed that data for many years.

19.    I have never discussed with Mr. Olson any changing methodologies for calculating assets and liabilities. My consistent understanding from him was that such sums are to be computed using the cost basis of assets and current value of liabilities under GAAP. Mr. Olson told me that he would not opine on or estimate a cost basis until he had sufficient data to justify it. His revisions of my net worth reflected the state of backup material I had provided to him just prior to the submission of each affidavit. Mr. Olson told me that until he was able to justify the cost basis of a retirement account, he would use its present value as of September 14, 2000. I cannot see how he ever deviated from this methodology.


OLSON'S THIRD AFFIDAVIT


20.    As stated above, I did progressively supply Mr. Olson with new data. Each affidavit reflected all the data I provided him at the time the affidavit was produced. It is possible that additional data could be discovered from external sources, but I do not believe it could change the cost basis of my retirement accounts.

21.    I did provide Mr. Olson with everything I could obtain that might be relevant to his analysis. I withheld nothing from him. I did not avoid finding anything.

22.    Each statement made by Mr. Olson in his affidavits reflecting statements he attributed to me were accurately and completely portrayed.

23. The $21,436.48 amount Mr. Olson cited as the cost basis of my prudential account was correct. The Network Systems 401(k) was transferred to an IBM EFCU IRA, then to a Fidelity account, then transferred to Prudential (while remaining in Fidelity), and then was rolled over into the Prudential account as described by Olson. There was no other cost basis for this account. All other contributions I ever made through all employment has been identified and iterated in Olson's affidavits, and Olson has correctly shown how they contributed to accounts that existed on September 14, 2000.

24. I have diligently searched for, and provided to Steven Olson, CPA, every document of which I am aware and can locate that could relate to my net worth as of September 14, 2000. I have also provided every such document that could relate to the net worth of my wife as of the same time. This includes life insurance accounts and annuities, real property, and everything else imaginable. I clearly stated this to Mr. Olson, as did my wife.

OTHER DISCUSSIONS WITH OLSON

25. On September 14, 2000 I had two substantial construction projects underway at my home. These projects were performed under contract and I provided full documentation to Mr. Olson of the projects, the payments, and the associated liabilities. Mr. Olson felt that these projects could not be considered to be liabilities for the purposes of these actions because I could not adequately prove to him that these efforts were repairs rather than replacements or new construction. Given the nature of the data I provided, the subjective difference between a repair and a replacement, and the clear existence of the action (the contracts and payment records exist, and the construction results still stand), I certainly did not feel that Mr. Olson acted in a "results-oriented" manner as alleged by the SEC. For example, I had substantial fencing and gating to repair around my property at considerable cost. Because I did not reuse (often rotting) material or pilings, Olson deemed my liability to be a replacement rather than a repair. Mr. Olson declined to list this and other committed efforts, which I documented to him, as liabilities in his affidavits, yet they were clearly obligations to pay, and I considered them to be repairs..

26. Mr. Olsen declined to opine on the cost basis of my Prudential retirement account when I was missing a single W-2. It is my understanding that Federal law at the time limited my contribution to $10,000 per year. When I had trouble finding the missing W-2 (it was amongst

the SEC subpoenaed documents) Olson declined to interpolate a cost basis by assuming a maximum contribution for the missing year, and continued to cite the much higher market value on September 14, 2000 until I could provide sufficient and complete documentation for my contributions.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct, executed this 28th day of October, 2005.

David W. Butler

K. L. DUBAL
Commission # 1358818
Notary Public - California
Santa Clara County
My Comm. Expires May 31, 2006

State of California County of
Santa Clara
Subscribed and sworn to (or affirmed)
Before me on this 28 day of Oct, 2005, by
David W Butler
personally known to me or proved to me on
the basis of satisfactory evidence to be the
person(s) who appeared before me.

Signature

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

    Plaintiff,

 v.

DAVID W. BUTLER,

    Defendant.

Civil Action No. 00-1827

Judge Cercone

### CERTIFICATE OF SERVICE

  I, Donald J. Enright, hereby affirm and attest under penalty of perjury that a copy of

Defendant David W. Butler's Memorandum of Law in Opposition to Plaintiff's Motion to Strike

was served by Federal Express upon:

Catherine Pappas, Esq.
United States Securities and Exchange Commission
Mellon Independence Center
701 Market Street, Suite 2000
Philadelphia, PA 19106

Timothy N. McGarey
Office of General Counsel
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

  Sworn and subscribed this 28th day of October, 2005.

           Donald J. Enright